[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1013 
This appeal involves the grade-crossing collision near Townley, Alabama, of a railroad train operated by Burlington Northern Railroad Company, and a tractor-trailer truck driven by William Whitt, who was killed in the accident. Burlington Northern sued Ligon Nationwide, Inc. ("Ligon"), as Mr. Whitt's employer, and Joan Faye Whitt, as administratrix of the estate of William Charles Whitt, on October 25, 1985. Burlington claimed that Whitt, in driving onto the crossing, negligently and/or wantonly caused the tractor-trailer that he was driving for Ligon to collide with Burlington's train, damaging it in the amount of $150,000. Mrs. Whitt counter-claimed against Burlington Northern, Inc., and several of its employees; she alleged that they were guilty of negligence and wantonness and that their negligence and wantonness had wrongfully caused Mr. Whitt's death, and she sought a judgment in the amount of $3 million. Following a trial, the jury awarded Mrs. Whitt $15 million. The trial court denied the counter-defendants' motion for a new trial, a judgment notwithstanding the verdict, or a remittitur. This appeal followed. We shall refer to the counter-defendants as the "defendants" and to the counterclaimant, Mrs. Whitt, as the "plaintiff."
 Facts
On Sunday, October 6, 1985, a freight train owned by Burlington Northern, Inc. ("Burlington"), was en route from Birmingham, Alabama, to Amory, Mississippi. The train consisted of two locomotives, 10 cars loaded with coal, and three empty cars. R.H. Shalhoop was operating the train and was seated on the right side of the lead locomotive. Henry Jackerson was seated on the left side of the lead locomotive and served as the crew's fireman. Also in the lead locomotive was the brakeman, Sidney McAnnally. The second locomotive was occupied by the flagman, Charles Chamblee, and the conductor, Guy Posey.
The train had stopped in Cordova, Dora, Alma, and Jasper, Alabama, and was travelling north to the next stop at Carbon Hill. Engineer Shalhoop testified that the speed limit set by Burlington for most of the distance between Jasper and Carbon Hill was 45 m.p.h., and the crew members estimated that the train was travelling at 42 or 43 m.p.h. before the accident. The train was equipped with a "black box," which contains a tape that records the train's speed, the time of day, the distance travelled, and the use of the train's braking systems. A printout of this information that was produced after the accident indicated that the train's speed at the time of impact was 48 m.p.h. Lehman Edgeworth, a Burlington trainmaster, testified that the printout indicated that immediately prior to the impact the train had been travelling at 50 m.p.h. Edgeworth also testified that the tape had a margin of error of plus or minus 5 m.p.h.
The accident occurred at 3:15 p.m. as William Whitt ("Whitt") travelled east on Highway 102 and across the tracks at the Townley-102 crossing and as the train was proceeding north. Thus, Whitt approached the crossing from the left side of the tracks, as viewed from the perspective of the train's crew. Approaching the crossing from the west, Whitt encountered several signs warning of the intersection: (1) A round orange highway sign with a black "X" and the letters "RR"; (2) a set of five speed bumps; (3) a white railroad warning painted on the roadway; (4) a railroad "crossbuck," a large "X" made of two crossed pieces of wood or metal, painted white with black lettering; and (5) red signal lights that are designed to flash automatically when a train approaches. A red stop sign is located on the east side of the railroad tracks, and requires motorists travelling from west to east on Highway 102 to stop at the intersection of Highway 102 and Highway 124; Highway 124 runs parallel to the train tracks near this intersection. Although the stop sign is on the east side of the tracks, the white line painted on the pavement marking the position in which motorists are to stop is located on the west side of the tracks, and, according to one witness, is approximately 20 feet 8 inches from the first rail. Whitt was familiar with this crossing, because his home *Page 1015 
was approximately one mile from the crossing, and he and his wife had lived there for 10 years. The plaintiff presented witnesses who testified that traffic at the crossing was fairly heavy on Sunday afternoons.
The train was equipped with headlights and a rotating "Mars" light on the front of the lead locomotive, and all of the lights were operating on the day of the accident. According to the train's crew members, Shalhoop blew the train's whistle and activated the train's air bell at the Moss-McCormick crossing, which is located approximately one-half mile south of the Townley-102 crossing. As the train proceeded northward, it passed a whistle board, a railroad sign indicating to the engineer that he should blow the train's whistle because the train is approaching an intersection, and crew members stated that Shalhoop blew the whistle again at that time. Several of the plaintiff's witnesses stated that they did not hear the train's whistle, or that they did not hear it until immediately before the impact. The defendants presented other witnesses who stated that they heard the whistle as the train approached and prior to the collision.
Whitt was driving a long-nosed tractor-trailer truck loaded with steel pipe. He had left his house just before the accident, intending to deliver the pipe for Ligon, for whom he worked. According to the crew members in the lead locomotive, and according to witnesses who approached the intersection in an automobile from the east side of the tracks and were facing Whitt as he approached, Whitt did not stop before he entered the crossing. The witnesses who saw the accident from their automobile testified that the truck slowed down as it neared the tracks, but that it pulled onto the tracks right in front of the train. Upon impact, the trailer separated from the cab, and the cab was pushed 2,046 feet down the tracks before it and the train stopped.
Engineer Shalhoop testified that he first saw Whitt's truck moving toward the crossing as the train approached the whistle board for the Townley-102 crossing, which was about one-half mile away. When he first spotted the truck, Shalhoop said, it appeared to him that it would stop at the crossing. Shalhoop testified that as the truck continued to move toward the tracks and he realized that it was not going to stop, he began blowing the whistle in warning blasts. Shalhoop said that when the truck passed the poles with the red signal lights, he placed the train into "emergency," which triggered all of the braking systems on the train, and he turned off the train's engine. Shalhoop stated that he could not have done anything else to prevent the accident. Shalhoop and conductor Posey testified that even if the train had been travelling at 33 m.p.h. when Whitt drove onto the tracks directly in front of the train, the train could not have been stopped before it struck the tractor-trailer at the crossing.
Whether the red warning lights facing Whitt were operating immediately before and after the impact was a much disputed issue. When the train approached the Townley-102 crossing, Whitt was the only motorist approaching from the west, so no witnesses were able to testify that the warning lights facing that side of the crossing were or were not flashing immediately before the accident. Five young women in an automobile waited at the intersection on the east side of the crossing, facing Whitt, as the train approached. Katrina Geib, the driver of the automobile, testified that as she drove up to the intersection she looked down the tracks and saw the train approaching. She stated that after she saw the train, she checked the signal lights facing her and they were flashing. Ella Barrentine, a friend of Mrs. Whitt's, testified that she lived approximately one block from the Townley-102 crossing at the time of the accident. She stated that she went to the crossing immediately after the accident, and that the signal lights on the west side of the crossing, from which Whitt approached, were not flashing. Anthony Whitt, the decedent's brother, testified that he was about one-half mile from the crossing at the time of the accident, and that he went to the crossing immediately after he heard the crash and saw smoke. He, too, testified that the signal lights on the west side of the crossing were not flashing when *Page 1016 
he arrived. Finally, Byas Gilbert testified that after he heard an explosion, he went to the Townley-102 crossing. He stated that the signal lights were not flashing when he arrived, but that a black man walked down the tracks from the direction of the train and entered the signal house next to the tracks and that the lights then began to flash.
The testimony of the defendants' witnesses conflicted on the issue of whether the signal lights were flashing at the time of and after the accident. Alabama State Trooper Steven Stevens testified that the signal lights on the west side of the tracks were flashing when he arrived at the accident scene at 3:34 p.m. to conduct an investigation. Fred Wilkerson, a Townley resident, testified that the signal lights at the Townley-102 crossing were not flashing when he arrived there after the accident, because, he said, the train had travelled past the switch that caused the signal lights to activate automatically. Conductor Guy Posey testified that, after the accident, he walked back to the Townley-102 crossing and that he noticed that the signal lights were blinking. Posey stated that the lights continued to flash because during the accident the bonding wire that activates the signals was broken. R.J. Shields, the signal maintainer for Burlington, also testified that all of the signal lights were flashing at the Townley-102 crossing when he arrived, and that they stopped flashing after he repaired a broken wire. Shields stated that he was the only Burlington employee at the scene with keys to the signal house. Finally, Henry Jackerson, the only black crew member, testified on direct examination that he did not walk back to the Townley-102 crossing after the accident or enter the signal house and activate the signals. On cross-examination, he testified that in a deposition he gave before trial, he had stated that he returned to that crossing and sat down.
Another issue in dispute at trial was whether the "peepholes" on the signal lights, which ordinarily permit the crew members on an approaching train to observe whether the lights facing motorists are flashing, were painted over at the time of the accident. Engineer Shalhoop testified that before the accident he could see through the peepholes of the signals on the east side of the tracks and that he observed that the signal lights were flashing. Trooper Stevens, R.J. Shields, and Burlington's claims representative, Layton Parrish, testified that the peepholes on the signal lights were not painted over on the day of the accident. To contradict the defendants' testimony, the plaintiff introduced photographs of painted peepholes at the Townley-102 crossing. Investigator Roger Argent testified that he photographed the peepholes on May 31, 1988, while the case was being tried before the jury, but also stated that he had viewed the scene two days after the accident, and that the photographs fairly and accurately depicted the condition of the peepholes from October 8, 1985, until the date he photographed the peepholes. Frank Cole, a criminal investigator, stated that he went to the accident scene on the morning of the day he testified and that the pole, fixture, and peepholes on the west side of the tracks appeared to have been painted.
Trooper Stevens interviewed several witnesses at the scene of the accident. He stated that nothing at the crossing obstructed an eastbound motorist's line of vision, and that a motorist could see a little less than a half mile down the track if he stopped at the white stop line painted on the pavement. The trooper also stated that his investigation suggested that the truck crossed the tracks at a slow rate of speed as it approached the intersection of Highways 124 and 102. On cross-examination, the trooper acknowledged that, in conducting his investigation, he spoke only with Burlington employees and that no other witnesses came forward to talk to him.
On October 25, 1985, Burlington sued Ligon and Mrs. Whitt for damage to its train and tracks that resulted from Mr. Whitt's alleged negligence. Mrs. Whitt and Ligon filed counterclaims against Burlington. Mrs. Whitt alleged that Burlington had negligently or wantonly failed to inspect and maintain its railroad crossing and she claimed property damages to the *Page 1017 
tractor-trailer of $40,000 and $3 million in punitive damages. She later filed a third-party complaint against Burlington employees Shalhoop, Shields, and L.B. Lane, and requested $3 million in punitive damages, claiming that they had acted negligently and/or wantonly and that their acts had caused Whitt's death. Before trial, Ligon paid $50,000 to Burlington as part of a settlement agreement, and Burlington's claims against Ligon and Mrs. Whitt were dismissed. As a result, the remaining parties were realigned, and Mrs. Whitt became the plaintiff. During the trial, the claims against Shields and Lane were dismissed and the case proceeded against Burlington and Shalhoop. The jury returned a verdict in favor of the plaintiff in the amount of $15 million. The trial court denied the defendants' post-trial motions and entered an order in compliance with Hammond v. City of Gadsden, 493 So.2d 1374
(Ala. 1986), and its progeny. This appeal followed.
 Decision
I. The defendants first contend that the trial court erred to reversal by permitting the plaintiff to inquire on voir dire whether any member of the venire was an insurance adjuster. They state that an insurance company was not a party in the case and argue that, under Cooper v. Bishop Freeman Co.,495 So.2d 559 (Ala. 1986), there was no legitimate basis for the question and that it resulted in ineradicable prejudice. We disagree.
In Alabama Power Co. v. Bonner, 459 So.2d 827 (Ala. 1984), we noted that very wide latitude has been allowed in voir dire examination and that the scope of the examination is left largely to the discretion of the trial judge. After discussing the importance of permitting trial lawyers a broad right to question prospective jurors as to matters that might assist them in determining the qualifications or possible biases of jurors so that the lawyers can intelligently exercise their peremptory strikes, we held that the trial court did not err in allowing the plaintiff to ask whether any member of a venireperson's family worked as an insurance adjuster for any company handling adjustments or worked as a secretary or salesman for any insurance company. Two years later, in Cooperv. Bishop Freeman Co., 495 So.2d 559 (Ala. 1986), the plaintiff objected to the trial court's refusal to ask the venire whether any member was related to any insurance adjuster employed by the insurance companies involved in the case. In holding that the trial court did not err in refusing the plaintiff's request, this Court overruled the majority opinion in Bonner
and adopted Justice Beatty's dissent in Bonner. In the Bonner
dissent, Justice Beatty expressed dissatisfaction with permitting "a blanket inquiry as to whether any of the venire members have any relatives who work in any capacity for any
insurance company," and asserted that such an inquiry had never been permitted in this state. Bonner, 459 So.2d 827, 835
(Beatty, J., dissenting). However, Justice Beatty also stated that he had no intellectual animosity toward such a change if any justification for it was advanced.
In this case, the plaintiff asked the following question: "Anybody here who is an insurance adjuster?" No member of the venire responded to the question and no follow-up questions were asked. This distinguishes the present case fromCooper, because the voir dire questions requested at trial by the plaintiff in Cooper asked whether any family members were employed by an insurance company. Further distinguishing this case is the fact that, when introducing the parties at defense counsel's table, the defendants introduced Layton Parrish and said he was a "claims agent" for Burlington. Mr. Parrish later identified himself as a senior claims representative, and several such references were made throughout the trial. The defendants claim that ineradicable prejudice resulted from the voir dire question because, they say, it left the jury with the impression that insurance would cover any verdict; however, it seems far more probable that if the jury had such an impression, it was the result of the defendants' decision to seat Mr. Parrish at the defense table and of *Page 1018 
their repeated references to him as a "claims representative."
Besides, we believe that the question "Anybody here who is an insurance adjuster?" was proper. It is undisputed that attorneys have the broad right to question venire members as to any matter that might disclose a prospective juror's bias, prejudice, or interest in the outcome of a trial. Inquiries such as whether the venire members or anyone in their families is employed by, for example, a trucking company, a bank, or a railroad, or is self-employed provide useful information about a juror's possible biases and allegiances. Limiting this otherwise broad right to question prospective jurors so as to exclude only the right to ask about insurance impermissibly hinders voir dire examination and is not justifiable. In attempting to strike a fair and impartial jury, attorneys have a legitimate interest in learning about any associations the venire has with the case, including the kind of work the prospective jurors and members of their families engage in.
 "It is a fact of life that no matter how honest and conscientious an individual may be, he is most likely to be influenced, if not actually biased, by his past or present occupational experiences."
Landers v. Long, 53 Ala. App. 340, 343, 300 So.2d 112, 114
(Ala.Civ.App. 1974). A general inquiry during voir dire such as the one made in the present case adequately protects the plaintiff's interest in securing an impartial jury and does not inevitably indicate to the venire that insurance is involved in the case. Insofar as the majority opinion in Cooper differs from the views expressed here, it is expressly overruled, and the majority opinion in Alabama Power Co. v. Bonner is again adopted as the law of this State.
Even if we were not convinced that the question is an appropriate one for voir dire examination, we could not reverse because of the trial judge's allowing the question. There was no objection to the question when it was asked. Four additional questions were asked before any objection was made to the question "Anybody here who is an insurance adjuster?" Failure to lodge a timely objection to an improper question asked on voir dire waives the point as error on appeal. C. Gamble,McElroy's Alabama Evidence, § 426.01(3) (3d ed. 1977).
In addition, the trial court offered to instruct the jury so as to avoid any possible prejudice that might have resulted from the question. The defendants expressly rejected this offer.
II. The defendants next argue that the plaintiff made an improper, prejudicial statement during her opening argument and that the court erred in overruling their objection to the statement and their motion for a mistrial. The allegedly improper statement was that the impact of the accident was so great that it tore off the top of Whitt's head. The record contains no evidence to support this statement.
There is a presumption in favor of the trial court's rulings on issues such as this, and we will not reverse on claims of improper argument unless substantial prejudice has resulted.Seaboard Coast Line R.R. v. Moore, 479 So.2d 1131 (Ala. 1985). Immediately before and during the plaintiff's opening argument, the trial judge explained to the jury several times that the attorneys' opening and closing remarks were not evidence and were not to be considered as a basis for the verdict. In his charge to the jury after the evidence was presented, the trial judge also gave thorough instructions explaining that only punitive damages were available in this wrongful death action, and that damages were not to compensate the family for Whitt's death. After carefully reviewing the record, we find that the remark complained of did not have sufficient prejudicial impact to serve as a basis for reversal.
III. Next, the defendants contend that admission of the testimony of a school bus driver, Shelby Nesmith, about a "near-miss" incident at the Townley-102 crossing two weeks after Whitt's accident, constitutes reversible error. Nesmith testified that she approached the crossing from the west in the school bus, stopped at the white line, and, because she saw and heard nothing, drove forward slowly. Nesmith stated *Page 1019 
that when she got onto the tracks, she saw a train but no crossing lights, and that she did not hear a whistle. Nesmith could not estimate how close the train came to hitting her, but stated that it was close enough that it "scared her to death." The defendants point out that Shalhoop was not the engineer of the train involved in the near miss, and they argue that Nesmith's testimony is also inadmissible because, they say, it does not address their knowledge of an allegedly dangerous condition prior to the accident.
This Court has held that evidence of subsequent accidents and injuries is not admissible to prove that a defendant knew of the dangerous condition at the time of the accident that is the basis for the lawsuit. Hyde v. Wages, 454 So.2d 926 (Ala. 1984). However, evidence of other accidents, occurring before and after the accident in question, is admissible on the issue of whether a place was safe if the condition of the place of the accident in suit was substantially the same as it was at the time of the other incident. C. Gamble, McElroy's AlabamaEvidence, § 83.01(3) (3d ed. 1977). Furthermore, evidence of the failure of crossing devices at a railroad crossing to operate before or after the accident in suit may be admitted if substantially similar conditions existed at the time of the accident and when the failure of the signals occurred. Annot., 46 A.L.R.2d 930 (1956). The failure of signals at another time can be admitted to show the failure of the signals to operate at the time of the accident, to rebut specific evidence of the defendant railroad that the lights must have been functioning properly, or to show absence of contributory negligence. Id.
Decisions as to the admissibility of other accidents are, like decisions regarding the admissibility of evidence in general, largely left to the sound discretion of the trial court; it is within the court's discretion to limit evidence of other occurrences when the evidence offered would divert the jury's attention more than it would serve to enlighten the jury on a question at issue. Murray v. Alabama Power Co., 413 So.2d 1109
(Ala. 1982).
In this case, the evidence regarding whether the warning signals were operating and whether visibility at the crossing was obstructed was in conflict throughout the trial. Nesmith's testimony was relevant and was probative of whether the crossing was dangerous and whether Whitt acted reasonably. The incident about which Nesmith testified occurred two weeks after the accident; this fact permitted an inference of substantial similarity of conditions. Nesmith also testified that she was familiar with the crossing and that conditions at the time of her near-miss were substantially similar to those that existed at the time of the accident. While the evidence may have been of limited probative value, its admission, under these circumstances, did not constitute reversible error.
IV. The defendants also argue that testimony about painted peepholes at the crossing and photographs depicting the peepholes should not have been admitted. Frank Cole, a criminal investigator, stated that he visited the Townley-102 crossing on the morning of his testimony at trial. He testified that he looked at the pole with flashing signal lights located on the west side of the tracks and that it appeared that the pole, the fixture, and the peepholes had been painted. The defendants argue that the testimony was unfounded and that Cole was never qualified as an expert.
Several of the defendants' witnesses testified that the poles and peepholes had not been painted, so Cole's testimony was admissible as rebuttal. The plaintiff did not present Cole as an expert; he merely testified as a lay witness that he looked at the poles and that they appeared to have been painted. InWright v. Rowland, 406 So.2d 830 (Ala. 1981), we held that the trial court did not err when it permitted a lay witness to testify that skidmarks he observed were not fresh, but were a day or two old. We stated there:
 "When a fact cannot be reproduced and made apparent to the jury, a witness may describe the fact according to the effect produced on his mind; or if, from the nature of the particular fact, better *Page 1020 
evidence is not attainable, the opinion of a witness, derived from observation, is admissible."
406 So.2d at 830. We also noted in Rowland that the witness's statements were a shorthand rendition of the collective facts, and that that, too, precluded a finding of error. For these reasons, the trial court here did not err in admitting Cole's testimony.
The defendants also claim error in the admission of testimony by investigator Roger Argent and the admission of certain photographs depicting the painted peepholes on signal lights at the Townley-102 crossing. Argent testified that he was at the crossing on October 8, 1985, and observed the signal lights at that time. He stated that he had returned to the crossing several times, and that on May 31, 1988, he took photographs of the peepholes. He further testified that the photographs fairly and accurately depicted the way the lights looked from October 1985 until the day of trial. The defendants objected to admission of the photographs, on grounds that a proper predicate had not been laid. The trial court sustained the objection initially, but admitted the photographs over objection when the plaintiff offered them a second time. The defendants now contend that the photographs were inadmissible because Argent did not testify that they accurately depicted the condition of the peepholes from October 6, 1985, the date of the accident, to the day of trial.
It is well established that the admissibility of a photograph is left to the sound discretion of the trial court and that its decision will not be reversed except on a showing of an abuse of that discretion. Harrison v. Woodley Square Apartments,Ltd., 421 So.2d 101 (Ala. 1982). A photograph is relevant and admissible in order to explain and apply the evidence when it will enable the court and the jury to better understand the conditions or matters in issue. Olympia Spa v. Johnson,547 So.2d 80, 82 (Ala. 1989). Argent testified that he viewed the scene soon after the accident and that the photographs were a correct depiction of the scene at that time. Admittedly, the photographs may have had limited probative value; however, we are unable to say that the trial court abused its discretion in allowing them into evidence.
V. The defendants raise several issues relating to the court's charge to the jury. They argue, first, that the trial court erroneously emphasized wantonness to the jury. Specifically, they point to the judge's statement to the jurors that if he were making notes in the case, he would write the terms "simple negligence," "contributory negligence," and "wantonness," and he would draw lines to separate them. The judge's suggestion of line-drawing was nothing more than a recommendation designed to facilitate the jurors' understanding of the complex instructions and theories involved. This did not place undue or prejudicial emphasis on the issue of wantonness.
The defendants also argue that the court erroneously instructed the jury, in several of its charges, that excessive speed through a "populous crossing" is sufficient to support a claim for wantonness. They argue that the court failed to include in the charges a statement that the plaintiff had to demonstrate that engineer Shalhoop knew of the character of the crossing at the time of the accident and consciously operated the train at an excessive speed and without warning of its approach.
In examining a trial court's instructions to a jury, a court of review considers the challenged instructions as a part of the entire charge, and if the charge as a whole states the law correctly, there is no reversible error. Grayco Resources, Inc.v. Poole, 500 So.2d 1030 (Ala. 1986). We have reviewed the complete oral charge to the jury and find that it adequately informed the jury of the relevant legal principles associated with the wantonness issue. In context, the total charge does not instruct that wantonness is proved merely by showing excessive speed at a populous crossing.
Finally, the defendants contend that the court erred in failing to give their requested charge on proximate cause and wantonness. *Page 1021 
The defendants argue that the following instruction should have been given:
 "The Court charges the jury that unless you are reasonably satisfied from the evidence that the Highway 102 crossing was normally a populous and much frequented crossing around three o'clock in the afternoon on Sunday and that the defendant R.H. Shalhoop had notice or knowledge of the crossing and the frequency of its use, you cannot find that the defendants were guilty of wanton conduct."
We have examined the court's charge to the jury and have determined that the principles of law in the requested charge were encompassed adequately in the court's oral charge. Therefore, we find that reversal is not mandated on grounds that the jury was not properly charged.
VI. The defendants next argue that the verdict is against the weight of the evidence; more specifically, they claim that no evidence of wantonness was presented and that the evidence established instead that Whitt was contributorily negligent. Regarding proof of wantonness, the defendants argue that the plaintiff failed to show that Shalhoop was consciously exceeding the speed limit while failing to give proper warnings and failed to show that he acted with the knowledge that at 3:15 on a Sunday afternoon, motorists would be on the Townley-102 crossing. Regarding contributory negligence, they argue that they demonstrated that, as a matter of law, the proximate cause of the accident was contributory negligence on the part of Mr. Whitt and, therefore, that the court erred in denying their motion for a directed verdict and their alternative JNOV/new trial motion.
A court of review accords a jury verdict, supported by the evidence, a strong presumption of correctness. Fennell RealtyCo. v. Martin, 529 So.2d 1003 (Ala. 1988). This presumption is strengthened by the trial court's denial of a motion for a new trial. Howard v. Crowder, 496 So.2d 31 (Ala. 1986). In the review of a jury verdict, a court must consider the evidence in the light most favorable to the prevailing party, and must set aside a verdict only if it is shown to be plainly and palpably wrong. Campbell v. Burns, 512 So.2d 1341 (Ala. 1987).
Our thorough review of this record does not convince us that the jury's verdict is plainly and palpably wrong so that its reversal is required. To the contrary, significant evidence was presented, which, if believed by the jury, thoroughly supported the verdict. The defendants correctly point out that a finding of wantonness requires proof that the defendant acted with knowledge of the danger or with consciousness that injury was likely to result from an act or an omission to act. CentralAlabama Elec. Coop. v. Tapley, 546 So.2d 371 (Ala. 1989). The jury could have found that the train approached the crossing at a speed in excess of its company's rules, that the engineer was familiar with this crossing because he travelled through it six days per week, and that he did not blow the train's whistle or activate the train's braking systems until shortly before the impact. The jury could have found also that an eastbound motorist's line of vision down the tracks was obstructed, that the peepholes on the flashing signals were covered with paint, and that the signal lights on the west side of the crossing were not flashing when Mr. Whitt crossed. There was, without a doubt, substantial evidence of wantonness, and we hold that the issue was properly submitted to the jury.
Similarly, the issue of contributory negligence is one for the jury when there is evidence to support a claim of contributory negligence. Tapley, supra. To prove contributory negligence, a defendant must show that the plaintiff knew of the condition, appreciated the danger of the circumstances at the moment the incident occurred, and placed himself in danger's way. Watters v. Bucyrus-Erie Co., 537 So.2d 24
(Ala. 1989). Only when the facts are such that all reasonable men must reach the same conclusion can contributory negligence be found as a matter of law. Watters. As discussed above, the evidence conflicted and the conflicts were for the *Page 1022 
jury to resolve. The jury could have believed that, although Whitt was familiar with the crossing, he was unaware as he approached it on October 6 that the train was nearing the intersection because his view down the tracks was obstructed, because the signal lights were not flashing to warn of the approach, and/or because the train's whistle was not blowing. If the jury believed these facts to be true, it could have found that, when easing forward onto the tracks, Whitt did not appreciate the danger or fail to exercise reasonable care. In short, there was sufficient evidence to defeat the defense of contributory negligence, and the issue was properly submitted to the jury for its resolution.
There was credible evidence to support the jury's verdict. The evidence presented at trial on many of the issues was in direct conflict. It was for the jurors, who heard the evidence and saw the demeanor of the witnesses, to determine what the facts were. Because we cannot say that the verdict was against the great weight of the evidence, it will not be set aside.
VII. The final argument advanced by the defendants is that the verdict is excessive. They say "for such a simple, routine crossing accident, this fifteen million dollar verdict is on its face, defective." They advanced the same argument in support of their motions for JNOV or new trial. The trial court held a hearing on those motions, as required by Hammond v. Cityof Gadsden, 493 So.2d 1374 (Ala. 1986), and entered the following order:
 "This cause coming on to be heard on the Motion for New Trial and in the Alternative, Motion for Judgment Notwithstanding the Verdict and in the Alternative, Request for a Remittitur of the Verdict and Damages. In this case the jury returned a verdict in the amount of Fifteen Million ($15,000,000.00) Dollars.
 "Defendants argue that the verdict is excessive and due to be set aside or reduced.
 "The Supreme Court gives guidelines for the trial court to apply in the analysis of a case where the defendants contend there is an excessive award of damages.
 "This case was tried under the Wrongful Death Statute. The culpability of the defendants' conduct and defendants' ability to discourage others from similar conduct is basis upon which damages are to be awarded by a jury in such cases.
 "In keeping with Hammond, a mandate by the Supreme Court of Alabama, this court has reviewed this case thoroughly. It is clear to the court that this verdict was not rendered or based on bias, passion, prejudice, corruption or improper motive, nor does it appear to this court, after the voir dire, that this jury was predisposed to the plaintiff or to the defendants prior to the taking of evidence in the case. It is the opinion of this court that the defendants' assertion that the verdict is excessive is based solely on the dollar amount and that the issues would not have been raised had the dollar amount been substantially less.
 "The jury was selected from a regular panel assigned to this Judge by Hon. James E. Wilson, Circuit Judge, presiding over the Civil Jury Docket for this term of court. This court observed no irregularities with regard to said assignment of the jury panel and the attorneys were allowed to ask all questions on the voir dire to the jury that the court deemed reasonable and pertinent to this case. For this reason, the court believes that the jury consisted of twelve men and women who were qualified to sit as jurors. The Court believes that the jurors were very attentive and patient and considered all evidence as it was presented.
 "A question has been raised with regard to juror Karen Akins in that her first cousin and neighbor had been or was being represented at the time of the trial by David Johnson, Attorney for the plaintiff in this cause. In review of the voir dire questions asked by the defendant in this case, a question with regard to a relationship of a cousin and/or neighbor was not asked, though the defense was given an opportunity to ask *Page 1023 
such a question and did, in fact, inquire into immediate family relationships.
 "On this point the court finds that there was no evidence of any impropriety, bias or prejudice on the part of juror Karen Akins and that she was qualified to serve as a juror on this case.
 "The court finds in its review of the case and in its recollection of the proceedings that there is nothing irregular or prejudicial with regard to the impaneling or selection of the jury and that the jury did nothing out of the ordinary during the trial of this case, which would suggest any impropriety, bias, prejudice, or improper motive on their part.
 "With regard to evidence heard by the court and by the jury, the court finds that there was much conflicting evidence in the trial of this case. The court further finds that there was evidence presented [from] which the jury, should they believe it, could have found that the plaintiff was contributorily negligent in the operation of his vehicle in crossing the tracks. The jury apparently believed the plaintiff's evidence in the case and disregarded the claim of contributory negligence, hence the award.
 "Under Alabama law, punitive damages are to deter future wrongful conduct. In this court's opinion there are no real guidelines to be used to determine the amount of damages to be awarded to punish individuals or corporations without the knowledge of their assets. In fact, the law in Alabama prohibits an inquiry into such matters. Fifteen ($15.00) Dollars would punish one person where Fifteen Million ($15,000,000.00) Dollars might not punish another. This leaves a jury question as to the proper amount to be assessed.
 "This court is not armed with more information than the jury had with regard to the amount that would be required to punish the defendants. Though the court was privy to settlement discussions the amounts discussed cannot be binding on the court or be used to influence the court's judgment in determining whether the amount the jury awarded is excessive. To use these standards would completely eviscerate the principle of a trial by an impartial jury and an impartial judge sitting to determine the facts and the law in any civil case.
 "There is no question in the mind of this court that the jury award of Fifteen Million ($15,000,000.00) Dollars surprised all parties involved. If this court were to try this case without the intervention of a jury, the result may have been different with regard to the verdict and/or the amount, and in fact, this court would not have awarded such an amount, but this is not to say the Fifteen Million ($15,000,000.00) Dollars awarded by the jury is excessive, as reasoned above. Even in reviewing judgments which have been entered in similar Wrongful Death cases throughout the State of Alabama and other parts of the Country, this court finds that Fifteen Million ($15,000,000.00) Dollars is one of the highest awards given by a jury in such cases.
 "There is no evidence before this court as to the impact upon the defendants but the court assumes that the impact is considerable. The court is of the opinion that the amount of this verdict has a far reaching impact upon this community and the business community of the State of Alabama as a whole. These issues and problems created by the amount of this award most surely could have been corrected by doing away with a jury in the trial of this case and similar cases. If one believes in the jury system in civil matters, it is the opinion of this court that in the absence of clear bias, passion, prejudice, corruption or improper motive on the part of the jury, then the jury verdict should stand even though the court may clearly understand the impact of such large award.
 "The opinion of this court corresponds almost identically with the opinion of the Supreme Court of Alabama as set out in State Farm Fire Cas. Insurance Co. v. Lynn, [516 So.2d 1373 (Ala. 1987)]. The trial court has carefully considered all matters and facts and cannot say that the verdict in this case is excessive as a *Page 1024 
matter of law, and finds no evidence of bias, passion, prejudice, corruption or improper motive on the part of the jury or any juror. To the contrary, having observed the jury during the trial of the case and having heard individual juror answers during voir dire of the case, the court finds the jury conducted itself properly and was very attentive during the taking of the evidence. Each juror was polled at the request of the defendants and confirmed that this was the verdict of each and every juror.
 "Though the amount of the award was startling to all parties involved, in review of the law of damages and remittiturs in the State of Alabama the trial court does not have sufficient guidelines to inquire past the point of the inquiry above which leaves the court in the position of substituting its guess for that of the jury for the amount of punitive damages that should be awarded in a case such as this.
 "It is also the opinion of this court that where there are high jury verdicts, additional and more instructive guidelines as to remittiturs should be established by the Appellate Courts or the State Legislature for reasons herein contained.
"It is, therefore,
 "ORDERED, ADJUDGED AND DECREED BY THIS COURT that the defendants' Motion for New Trial and in the Alternative, Motion for Judgment Notwithstanding the Verdict and in the Alternative, Request for a Remittitur of the Verdict and Damages should be and are hereby denied.
 "IT IS FURTHER ORDERED BY THIS COURT that no execution shall issue out of this Court prior to Wednesday, December 28, 1988, and that no action shall be taken by the plaintiff against any property of the defendants prior to said date and the defendants shall be allowed this amount of time to post bond for the appeal of this judgment.
 "DONE AND ORDERED THIS THE 21st day of December, 1988.
"/s/ James C. Brotherton, Circuit Judge"
Burlington renews in this Court its argument that the award is excessive and asks that it be reduced. The trial court has followed the Hammond guidelines and has found no reason to interfere with the verdict of the jury.
However, that does not relieve this Court of its responsibility to consider whether the award is excessive. As the only appellate court with the ability to assure some degree of uniformity in the area of punitive awards, we must also determine whether the award is excessive when compared to awards in similar cases. Having considered the record in this case, and having compared verdicts in similar cases that have come to this Court, we are of the opinion that the award of $15 million is excessive and should be reduced by $10 million. We therefore affirm the judgment of the trial court on the acceptance of a remittitur of $10 million by the plaintiff, Mrs. Whitt, within 30 days of the date of this opinion (September 21, 1990), which will result in a judgment in her favor of $5 million.
Accordingly, the judgment of the trial court is affirmed, conditioned upon the plaintiff's acceptance of the remittitur of $10 million as ordered by this Court.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J., and MADDOX, JONES, ALMON, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.