The defendant appeals from a judgment based on a jury verdict in favor of the plaintiffs, Helen Lewis Johnston and Ford Lewis.
The issues presented in this case are: (1) whether the trial court erred in admitting certain expert testimony; (2) whether the trial court erred in admitting reports of engine stallings; (3) whether the trial court erred in failing to grant a new trial based on alleged misconduct of the plaintiffs' attorney; and (4) whether the jury's award of $15,000,000 in punitive damages was excessive.
On August 12, 1987, Ford Lewis was driving a 1988, 2500 series Chevrolet pickup truck. Lewis had purchased the pickup truck two days earlier and had driven it less than 200 miles. His seven-year-old grandson, Barton (Bart) Griffin, was riding in the passenger seat. Lewis stated that as he attempted to drive through the intersection of Highway 10 and Highway 43 in Marengo County, the engine of his truck stalled. A tractor-trailer truck, driving through the intersection, struck the pickup truck, injuring Lewis and killing Bart. *Page 1056 
Lewis, along with Bart's mother, sued General Motors Corporation ("GM"), alleging that the pickup truck was "defective" under the Alabama Extended Manufacturer's Liability Doctrine (AEMLD). The plaintiffs also sued the driver of the truck and his employer, alleging negligence and wantonness.
As to their AEMLD claim, the plaintiffs asserted that there was a defect in the fuel delivery system and that that defect caused the engine to stall. Specifically, they asserted that a programmable read only memory chip ("PROM") was defective.
The PROM is located in the TBI/ECM system of this model truck. "TBI" stands for throttle body injection. "ECM" stands for electronic control module. The TBI/ECM system controls several engine functions, including the fuel delivery system. When a driver depresses the accelerator, a sensor transmits a command to the ECM. The memory programmed in the PROM, in turn, relays the command to the engine.
A PROM is installed in various GM vehicles. GM programs each PROM for the particular model engine through calibrations. The plaintiffs claimed that the PROM and its calibrations caused the pickup truck to stall on the date of the collision.
The plaintiffs averred that GM knew of stalling problems in the model truck in question and did not alert its customers. Instead, they asserted, GM issued a "silent" or "unpublished" recall whereby it informed all of its dealers to replace the PROM with a newly designed PROM if a customer complained that his engine stalled.
GM stated that no defect existed in the truck or the PROM and that, in fact, the engine was running and that Lewis negligently drove through the intersection and thereby caused the accident. GM claimed that it did not issue a silent recall, but had simply improved the PROM and had merely informed its dealers of such improvements.
At trial, Lewis testified that as he started driving through the intersection, his truck stalled. Lewis said he saw an 18-wheel, tractor-trailer truck fully loaded with logs approaching the intersection from about 700 feet away. Lewis claimed that he put the truck in "park" and tried to crank the engine, but that the engine would not start. The driver of the tractor-trailer truck testified that he blew his horn, then steered the truck into the left lane in an attempt to avoid colliding with Lewis. The tractor-trailer truck struck the pickup truck on the right side.
There were four additional witnesses to the collision, all of whom testified that the pickup truck stopped in the middle of the intersection. Each witness stated that Lewis would have had sufficient time to pass through the intersection had his pickup truck not stopped. Two of the witnesses said that it looked as though Lewis was attempting to recrank the vehicle immediately prior to the collision. The same two witnesses testified further that subsequent to the collision, in their attempts to extricate Bart from the truck, they noticed that the gear shift lever was in an upwards position. During that brief span, neither of the witnesses looked at any indicators on the dashboard.
State Trooper James Goodreau investigated the accident. He testified that the gear shift lever of the pickup truck was in the "park" position when he arrived on the scene. He stated that he could not be sure who or how many persons had had access to the pickup truck before he arrived. A Ms. Emily Goodwin, who arrived on the scene immediately after the accident, testified that the gear shift lever was up as far as it would go.
The driver of the tow truck, Neal Jackson, who towed Lewis's pickup truck away from the scene, testified that the gear of the truck was engaged and in "drive." He further said that no damage was done to the pickup truck while it was being towed.
Dr. Rudolph Limpert was called by the plaintiffs as an expert witness in mechanical engineering. GM interposed no objections as to Limpert's qualifications as an expert when he was proffered to the court.
Limpert expressed the opinion that the engine could not have been running at the time of the accident, and he based this *Page 1057 
opinion on his examination of the engine fan and shroud. He stated that the fan and shroud were only slightly damaged, indicating that the fan was not rotating at the time of the accident. In his opinion, what damage there was to the fan occurred as a result of the force of impact. Limpert testified that, in his opinion, the pickup truck transmission was in "park" at the time of the accident, based upon the condition of the drive shaft. Limpert concluded that the PROM and its calibrations were defective and were most likely the cause of the collision. GM cross-examined Limpert on his stated opinions.
After Limpert had testified and had been released as a witness, GM moved to strike Limpert's testimony. The trial court denied the motion, stating that GM had waived any objection to Limpert's testimony.
Dr. Julian Doughty, also an expert in mechanical engineering, testified for GM. He testified that the damage to the fan and shroud indicated that the engine was running at the time of the accident. He further expressed his opinion that the markings on the drive shaft indicated that the engine was running when the accident occurred.
GM called Frank Sonye to testify as to the design and development of the PROM. Sonye, an expert in computers, had worked for GM for 25 years. He stated that each PROM goes through various tests and safety checks, and that every vehicle is thoroughly tested before it is sent to a dealer. According to Sonye, upon delivery, a dealer gives each vehicle a check, which includes a visual inspection of the engine. Sonye also testified that the PROM design and development process is constant and ongoing.
The plaintiffs offered into evidence internal reports from GM concerning stalling problems in vehicles with a 5.7 liter engine like the one in Lewis' pickup truck. GM has a technical assistance network (TAN), through which mechanics and service managers from various dealerships may contact GM concerning problems. GM also has a customer assistance network (CAS), through which customers can report problems directly to GM. The plaintiffs offered 268 of these TAN and CAS reports. GM objected to 251 of them on the ground that they were not "substantially similar" to the alleged problem in the instant case in that a majority of the reports did not mention a PROM. The trial court overruled the objection, and the reports were admitted.
The plaintiffs also proffered a technical service bulletin that had been sent to all GM dealers; it stated that some of the engines in the 1987-1988 model trucks could experience certain problems that could be repaired by replacing the PROM. Those problems included "rolling, hunting, or surging idles." They offered a second technical service bulletin, which sought to eliminate rolling, surging, or rough idles, hesitation during engine warm up, and long crank times.
At the conclusion of the trial, the jury found for the plaintiffs and against GM. The jury awarded Lewis $75,000 in compensatory damages and awarded Bart's mother $15,000,000 in punitive damages under the Alabama Wrongful Death Statute. The driver of the tractor-trailer truck had been earlier dismissed, and the jury found no liability against the driver's employer.
GM filed a motion for a new trial, a JNOV, or a remittitur. The trial court denied the motion and entered an order in compliance with Hammond v. City of Gadsden, 493 So.2d 1374
(Ala. 1986), and its progeny.
 I. Did the trial court err in admitting theexpert testimony of Dr. Rudoph Limpert?
Limpert's expertise was in the field of mechanical engineering. It was apparent that Limpert was to testify as to his opinion on why the engine stalled.
GM made no objection to Limpert's qualifications as an expert prior to his testimony. While making a motion for a directed verdict at the close of the plaintiffs' evidence, GM moved to strike Limpert's testimony based on a lack of expertise. At *Page 1058 
that point, Limpert had already been dismissed as a witness in the case.
Clearly, GM should have objected to Limpert's qualifications as an expert before the close of the plaintiffs' evidence. GM should have objected prior to Limpert's testifying as to his expert opinion. By failing to do so, GM failed to preserve this issue for review.
Even if GM had properly preserved this issue for review, we would conclude that Limpert's testimony was admissible. The trial court has wide discretion in determining who may be qualified as an expert and its decision will not be reversed on appeal unless it abused that discretion. Baker v.Merry-Go-Round Roller Rink, Inc., 537 So.2d 1 (Ala. 1988). Based on the record, we would conclude that there was no abuse of discretion. Limpert was qualified as an expert in mechanical engineering. Limpert admitted on cross-examination that he had not participated in the design and development of a PROM. However, the record indicates that Limpert knew the fuel delivery system in this engine and was qualified to give his opinion as to whether and why the engine stalled.
GM contends that the plaintiffs failed to ask Limpert hypothetical questions and, thus, that his testimony was inadmissible. GM waived any objection to the form of the questions asked by the plaintiffs when it failed to object before the questions were answered.
In order to be timely, an objection to oral testimony must be made after the objectionable question is asked but before the objectionable answer is given. Davis v. Southland Corp.,465 So.2d 397 (Ala. 1985). Error cannot be preserved by an objection made after a responsive answer to the question asked is given. Id. In a situation where a witness answers so quickly that the party objecting does not have a reasonable chance to make an objection to the question before the answer is given, the party objecting should immediately make a motion to strike or to exclude the answer from the record. Green v. StandardFire Ins. Co., 398 So.2d 671, appeal after remand,477 So.2d 333 (Ala. 1981).
 "One of the most common reasons given for the requirement of a timely objection to an improper question is that it prevents the would-be-objector from speculating that the witness' answer will be favorable toward him. A second reason for the requirement is that a specific objection will enlighten the trial court and aid in its determination of whether the question is truly an improper one."
C. Gamble, McElroy's Alabama Evidence, § 426.01(2) (4th ed. 1991).
GM is now barred from objecting to the form of questions asked by the plaintiffs, because it failed to make a timely objection at trial.
 II. Did the trial court err in admitting GM'sinternal reports of other stalling problems invehicles with this engine?
GM argues that the trial court erred in admitting 251 CAS and TAN reports into evidence. GM argues that the problems dealt with in the vast majority of the internal reports were not substantially similar to the alleged problem in this case. GM contends that only 3 TAN reports and 5 CAS reports indicated that a replaced PROM definitely had repaired the stalling problem. Additionally, GM argues that only 8 TAN reports recommended the updating or replacing of the PROM. GM contends that replacing the PROM is the first repair that is done when a customer complains of stalling.
The plaintiffs claim that all 251 reports mention stalling problems and that the reports gave GM notice of problems with this model engine. The plaintiffs contend that 186 of the reports mention the ECM, the PROM, or the sensors as the part repaired or the cause of the stall. The plaintiffs contend that the trial court did not abuse its discretion in allowing these reports into evidence, because, they argue, the reports were all substantially similar to the stalling problem in Lewis's pickup truck.
All rulings on the admissibility of evidence under the "substantially similar" standard must be considered on a case-by-case *Page 1059 
basis. See, C. Gamble, McElroy's Alabama Evidence, § 64.04(1) (4th ed. 1991). The admissibility of such evidence is within the discretion of the trial court, and the court's ruling will not be reversed absent an abuse of that discretion. AlabamaPower Co. v. Brooks, 479 So.2d 1169 (Ala. 1985). In Brooks, the plaintiff was injured when his drilling machine came in contact with uninsulated power lines owned by the defendant. This Court held that the admission of an article that contained a summary of nationwide accidents with the same machine or a machine similar to the one involved in the suit and under the same or similar conditions was proper for showing that, nationwide, there was a problem with this type of machine coming in contact with uninsulated power lines. The article was also relevant as to the degree of care exercised by the defendant in maintaining this type of power line.
GM relies on Keller v. Goodyear Tire Rubber Co.,521 So.2d 1312 (Ala. 1988), for the proposition that the "substantially similar" standard has been severely restricted by this Court. In Keller, supra, the plaintiffs were injured after a tire on their automobile failed, causing the automobile to leave the road. The trial court properly refused to admit evidence of the failure of other tires over a six-year period because the plaintiffs failed to prove that the accidents occurred under the same or similar circumstances and because the plaintiffs failed to show that the failures were identical to the tire failure in that suit.
In the instant case, the 251 reports contained evidence of stalling problems in other vehicles with the identical engine as the one in Lewis's pickup truck. The trial court did not abuse its discretion in determining that these reports were substantially similar to the problem in the present case.
The plaintiffs claimed that Lewis's pickup truck stalled because of a defect in the fuel delivery system. All 251 reports from GM's dealers and customers state that the engine stalled or idled. The majority of the reports specifically mentioned the ECM, the PROM, or sensors connected to the ECM, which controls the fuel delivery system, as the problem or the repair needed. We find no abuse of discretion in admitting the reports.
 III. Did the trial court err in refusing togrant a new trial based on alleged misconduct bythe plaintiffs' attorney?
GM claims that the plaintiffs' attorney, Jere Beasley, engaged in trial misconduct that unfairly prejudiced GM. GM asserts that certain comments during cross-examination of GM's trial representative were made in order to bias the jurors. The most egregious conduct claimed as prejudicial by GM occurred when Beasley broke the fan shroud during closing argument. The plaintiffs contend that Beasley did not intend to break the fan shroud and that none of the comments made at trial were prejudicial.
The trial judge is vested with a wide discretion in determining whether incidents that occur during the course of a trial affect the rights of either party to have a fair trial, and the judge's action may not be reversed unless it clearly appears that the judge has abused that discretion.Bucyrus-Erie Co. v. Von Haden, 416 So.2d 699, 701 (Ala. 1982). The trial judge is in the best position to determine the probable effect of any comments or incidents occurring at trial. Id.
In its order denying GM's motion for a new trial, the trial court discussed the issue of the alleged misconduct
 "General Motors has filed a number of affidavits in support of its contention that a new trial is warranted as a result of damage to an exhibit which occurred during closing argument. It did not appear to the Court at the time that Mr. Beasley intentionally damaged the shroud. In fact, Defendant, General Motors made no objection at the time, did not request any instructions from this Court concerning the event, and did not move for a mistrial. The Court was not surprised at General Motors' decision not to raise the issue at the time since the *Page 1060 
evidence that the vehicle stalled was overwhelming and the breaking of the shroud during closing argument seemed insignificant. The Court finds this ground of Defendant General Motors to be totally without merit.
". . . .
 "General Motors cites as examples of what it contends to be improper conduct certain exchanges between Plaintiffs' counsel and General Motors' trial representative. Most of these occurred without any objection from defense counsel. On the rare occasions that Plaintiffs' counsel asked a question which called for inadmissible evidence, this Court sustained the objection from the defense counsel. In this Court's opinion, this ground asserted by General Motors is absolutely without merit."
(C.R. 898-900).
After a thorough review of the record, we conclude that the trial court did not abuse its discretion in denying GM's motion for a new trial based on alleged attorney misconduct.
 IV. Was the jury's award of punitive damagesexcessive?
The right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const of 1901, and therefore a jury verdict may not be set aside unless the verdict is flawed, thereby losing its protection. Hammond, 493 So.2d at 1378. With regard to damages, a jury verdict may be flawed in two ways.
 "First, it may include or exclude a sum which is clearly recoverable or not as a matter of law, or which is totally unsupported by the evidence where there is an exact standard or rule of law that makes the damages legally and mathematically ascertainable at a precise figure. . . . Second, a jury verdict may be flawed because it results, not from the evidence and applicable law, but from bias, passion, prejudice, corruption, or other improper motive."
Hammond, 493 So.2d at 1378. The presumption of correctness of a jury verdict can be overcome only by a clear showing that the amount of the award is excessive. Green Oil Co., 539 So.2d 218
(emphasis added). "It is well understood that in considering the adequacy or excessiveness of a verdict, each case must be determined on its own facts, and that neither the trial court, nor this Court, may substitute its judgment for that of the jury." Green Oil Co., 539 So.2d at 222, citing City Bankof Alabama v. Eskridge, 521 So.2d 931 (Ala. 1988); Hammond,493 So.2d 1374.
The trial court entered the following order:
"The Court will now review the issue of damages. In doing so the Court will follow the directions of the Supreme Court as outlined in Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), and Hammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986).
"1. THE HARM LIKELY TO OCCUR AND THE HARM THAT ACTUALLY OCCURRED.
"This case involved the death of a seven-year-old innocent child. There is no harm greater than death. The Court finds that such harm is grievous and therefore the damages should be high.
"It is also critical that it is foreseeable to the Defendant that such harm would occur. General Motors was well aware that the defects in this vehicle could cause stalling. As a manufacturer of automobiles, General Motors certainly knew that if a vehicle stalls in a busy intersection, there is a likelihood of a serious accident and death. Defendant's conduct is likely to cause injury or death to others if not remedied.
"2. THE DEGREE OF REPREHENSIBILITY OF DEFENDANT'S CONDUCT.
"The evidence showed that General Motors was aware of this hazard prior to placing the vehicle on the market. Evidence further showed that after complaints were made . . . General Motors revised the PROM in an attempt to correct the problem. General Motors, however, concealed this from the public and did not notify any *Page 1061 
of its purchasers, or prospective purchasers, of the problems related to these vehicles. Accordingly, the Court finds . . . the degree of reprehensibility of Defendant General Motors in this case to be great and that the damages should be high.
"Simply put, General Motors made a business judgment to risk damage to property and persons from the defect in the vehicle rather than to expend the substantial sum necessary to recall and replace the defective PROMs. This is not a case where the death occurred as a result of mere inadvertence nor even where wanton conduct occurred on a single occasion. Here General Motors placed hundreds of thousands of its customers' lives at risk in order to save money and increase its profits. In this Court's opinion, its wrongdoing was both intentional and totally intolerable in our society.
"In considering the degree of reprehensibility of the Defendant's conduct, this Court should consider the duration of the conduct, the degree of Defendant's awareness of the hazard which the conduct caused or is likely to cause and any concealment or coverup of that hazard. As previously noted, General Motors was aware of the defect in the fuel delivery system during the design phase and has had numerous reports of malfunction since these vehicles were manufactured and sold. The Defendant admitted that it never advised purchasers of the vehicle of the problems but rather utilized what was referred to at trial as a 'silent' or 'unpublished' recall. If a complaint was made concerning a malfunction of the fuel delivery system, General Motors would install a new PROM with no cost to the customer. By handling the defect in this manner, General Motors avoided the necessity of replacing the PROM for customers who did not complain. Clearly, it covered up the existence of the hazard by this procedure.
"This Court understands it is to consider verdicts in similar cases in determining whether the wrongful death damages awarded were excessive. Unfortunately, this Court can find no reported decision in Alabama where a defendant's conduct even approached the degree of reprehensibility of Defendant General Motors' conduct in this case. Certainly the conduct of the Defendant inClardy v. Sanders, 551 So.2d 1057 (Ala. 1989), was egregious in racing down a city street while intoxicated. However, that conduct occurred on a single occasion and while it put numerous persons at risk, in this Court's opinion it in no way approached the disregard for human life evidenced by General Motors in this case.
"The Court has considered the very recent case of [Burlington Northern R.R. v. Whitt, 575 So.2d 1011 (Ala. 1990),] decided by the Supreme Court of Alabama. In that case the court reduced a wrongful death award from $15 million to $5 million. There is simply no comparison between the conduct of the Defendant General Motors here. The decision by the Alabama Supreme Court to uphold a $5 million recovery in that case is substantial authority that this verdict should not be reduced.
"This Court has been provided with evidence of verdicts of this size or larger in other courts in Alabama and verdicts of this size or larger which have been affirmed in appellate courts in other states. The amount of this verdict is certainly not shocking considering the wrongdoing of Defendant General Motors.
"3. PROFIT.
"Evidence was produced showing that General Motors sold approximately 600,000 of these vehicles. Evidence was also produced to show that if General Motors replaced the PROM on any vehicle, it would cost General Motors approximately $70.00. Thus, General Motors saved approximately $42,000,000.00 by not having a recall or otherwise notifying its purchasers of the problem related to the PROM. This profit does not even consider any potential loss of sales that General Motors would have suffered if it notified customers of the problem.
"Our Supreme Court's decisions in Green Oil and Hammond
indicate that a verdict which does no more than remove the profit enjoyed by the wrongdoing defendant cannot be considered excessive. In *Page 1062 
this case, even after paying the verdict, General Motors will save approximately $27 million by not recalling this defective PROM. This factor weighs heavily against any reduction in this verdict.
"4. FINANCIAL POSITION OF GENERAL MOTORS.
"Defendant General Motors takes the position that its financial condition is irrelevant to its request for a remittitur. However, the financial position of General Motors certainly does not justify or support any reduction in this verdict. As discussed above, the amount of the verdict is not even one-half of the profit General Motors received as a result of its decision not to recall the defective PROM.
"5. COST OF LITIGATION.
"The Court is aware that Plaintiffs incurred a great deal of expense in preparing this case. The Court knows that Plaintiffs' attorneys had to fly to Detroit on two occasions and otherwise spend a great deal of time and money in order to prepare this case. Numerous other depositions were taken in an effort to prepare this case. Accordingly, the Court finds that the verdict should be high in order to encourage Plaintiffs, such as these, and their attorneys, to pursue this type of case. If the verdict was reduced, the Court fears that there would be chilling effect upon Plaintiffs, and Plaintiffs' attorneys, in the future that would discourage them from bringing wrongdoers to trial. This factor certainly does not weigh in favor of reducing this verdict.
"6. CRIMINAL SANCTIONS.
"There has been no evidence produced that any criminal sanctions have been imposed upon General Motors for its conduct related to this matter. Accordingly, the Court sees no basis to reduce the verdict by applying this factor.
"7. CIVIL ACTIONS.
"The Court is not aware of any other civil actions that have been maintained against General Motors based upon this same conduct. Accordingly, the Court concludes that the verdict should not be reduced based on this point.
"The Court finds that the verdicts in this case were in no way affected by bias, passion, prejudice, corruption, or other improper motive or conduct. The Court finds that the jury's verdict was not based on anything other than a conscientious desire on the part of the jury to render a just verdict in keeping with the Court's charge. The case was well tried on both sides. This Court is of the opinion that both counsel for Plaintiffs and counsel for Defendants conducted themselves in accordance with the high standards of conduct required by the members of our profession. No untoward event occurred during the trial. This Court had the opportunity to observe the jurors throughout the trial and notes that each of them paid attention to the evidence, argument of counsel, and the Court's charge.
"The Court further finds that there was no indication, either during or after the trial, to even suggest that the jury acted improperly or that the verdict was based on prejudice, sympathy, or favoritism. To the contrary, the Court finds that the twelve people who decided this case were good and reliable citizens who discharged their duty in a conscientious manner. The Court fully charged the jury on the question of damages in accordance with the decisions of the Supreme Court. At the conclusion of the Court's charge, the Court asked all parties whether they had any objections to the charges and General Motors responded that it was satisfied with the charge.
 "CONCLUSION
"The Court concludes that this was tried before a fair and impartial jury. There was substantial evidence to support the jury's verdict. That the verdict was not the result of any bias, prejudice, or passion. The amount of the verdict was warranted by the evidence of the Defendant's wrongdoing. Accordingly, the Court is of the opinion that General Motors' Motion for New Trial, JNOV, and Remittitur, is due to be, and the same is hereby denied. *Page 1063 
"DONE and ORDERED this the 28th day of November, 1990.
"/s/ Claud D. Neilson
Circuit Judge"
GM contends that the punitive damages award to Bart Griffin's mother in the amount of $15,000,000 is excessive. First, GM argues that the use of the Hammond, 493 So.2d 1374, and GreenOil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), factors has been approved by the United States Supreme Court only in cases where the punitive damages award bears an understandable relationship to the compensatory damages awarded. See Pacific MutualInsurance Co. v. Haslip, ___ U.S. ___, 111 S.Ct. 1032,113 L.Ed.2d 1 (1991). There were no compensatory damages awarded to Bart Griffin's mother, because the Alabama Wrongful Death Statute does not allow for compensatory damages. Therefore, GM argues that the use of the Hammond and Green Oil Co. factors is inappropriate and insufficient to protect GM from an excessive verdict. Second, GM argues that even under a review of theHammond and Green Oil Co. factors, the verdict is excessive.
GM argues that the post-verdict standards for reviewing punitive damages awards in Alabama do not apply in wrongful death cases even though the standards have been approved by the United States Supreme Court. Haslip, ___ U.S. ___,111 S.Ct. 1032. GM contends that the lack of compensatory damages in a wrongful death case eliminates an important part of the reviewing process because there is no way to determine if an "understandable relationship" exists between the punitive and the compensatory damages awards.
Because the law of Alabama prohibits the award of compensatory damages in wrongful death cases, no understandable relationship can exist between compensatory and punitive damages. The reason Alabama's Wrongful Death Statute forbids compensatory damages is that "one may be adequately compensated for his injuries, but the value of a human life has no measure. Punishing the tort-feasor dissuades others from engaging in life-endangering conduct." Central Alabama Electric Cooperativev. Tapley, 546 So.2d 371, 376 (Ala. 1989).
The United States Supreme Court has held that theHammond and Green Oil Co. factors provide a meaningful and adequate review of whether a punitive damages award is reasonable in amount and rational in light of the purpose of punitive damages, which is to punish and deter. "The application of these standards, we conclude, imposes a sufficiently definite and meaningful constraint on the discretion of Alabama fact finders in awarding punitive damages." Haslip, ___ U.S. at ___, 111 S.Ct. at 1045. Although the punitive damages award in Haslip was based on a fraud claim, we have consistently held that the Hammond factors ensure an adequate and meaningful review of a punitive damages award in a wrongful death case. See, e.g., Alabama Power Co. v.Turner, 575 So.2d 551 (Ala. 1991) cert. denied, ___ U.S. ___,111 S.Ct. 2260, 114 L.Ed.2d 713 (1991); Burlington NorthernR.R. v. Whitt, 575 So.2d 1011 (Ala. 1990) cert. denied, ___ U.S. ___, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991); Clardy v.Sanders, 551 So.2d 1057 (Ala. 1989) cert. denied, 493 U.S. 959,110 S.Ct. 376, 107 L.Ed.2d 362 (1989); Central Alabama ElectricCooperative v. Tapley, 546 So.2d 371 (Ala. 1989); andIndustrial Chemical Fiberglass Corp. v. Chandler,547 So.2d 812 (Ala. 1988).
Even in non-wrongful death cases where compensatory damages are allowed, we have held that punitive damages need bear no relationship to actual damages, but should not exceed an amount that will accomplish society's goals of punishment and deterrence. Green Oil Co., 539 So.2d 218. Where excessiveness of punitive damages is the issue, the focus is on the defendant with regard to any assessment of punitive damages. Wilson v.Dukona Corp., 547 So.2d 70 (Ala. 1989).
It is now the responsibility of this Court to consider whether the award is excessive. We believe that it is helpful in this regard to compare the facts of this case to those of other cases wherein large sums of punitive damages have been *Page 1064 
awarded, in order to assure some degree of uniformity. In other jurisdictions, substantial punitive damages awards have been upheld in wrongful death actions. See, e.g., Mason v. Texaco,Inc., 948 F.2d 1546 (10th Cir. 1991) ($25 million punitive damages award remitted to $12.5 million in a wrongful death action for a misleading warning on Benzene); O'Gilvie v.International Platex, Inc., 609 F. Supp. 817 (D.Kan. 1985), aff'd in part and reversed on other grounds, 821 F.2d 1438
(10th Cir. 1987), cert. denied, 486 U.S. 1032, 108 S.Ct. 2014,100 L.Ed.2d 601 (1988) ($10 million punitive damages award in products liability action based on death due to toxic shock syndrome found not excessive); Ford Motor Co. v. Stubblefield,171 Ga. App. 331, 319 S.E.2d 470 (1984) ($8 million punitive damages award not excessive where 15-year-old passenger was killed due to fire from rear-end collision and internal memo indicated that the defendant knew of safety hazard and deferred adopting safety measures in order to protect profits); Channel20, Inc. v. World Wide Tower Services, Inc., 607 F. Supp. 551
(S.D.Tex. 1985) ($5 million punitive damages award to 5 estates was not excessive where evidence showed that deliberate use of cost-cutting measures at the expense of reasonable safety precautions caused the deaths); Hasson v. Ford Motor Co.,32 Cal.3d 388, 185 Cal.Rptr. 654, 650 P.2d 1171 (1982), cert. denied, 459 U.S. 1190, 103 S.Ct. 1167, 75 L.Ed.2d 422 (1983) ($4 million punitive damages award for death due to brake failure not excessive where manufacturer was aware of faulty brakes and did not issue any warnings).
In Clardy v. Sanders, 551 So.2d 1057, the jury awarded the plaintiff $2.75 million in punitive damages against the estate of a driver who, while racing his automobile down the street, pulled into the opposite lane and caused a collision, killing himself and the plaintiff's daughter, who was riding in the other vehicle. This Court upheld the jury award. In Black BeltWood Co. v. Sessions, 514 So.2d 1249 (Ala. 1986), this Court held that the plaintiff's award of $3.5 million in punitive damages, based on the fact that a log fell from a passing log truck and killed the plaintiff's 19-year-old son, was not excessive. The jury in Olympia Spa v. Johnson, 547 So.2d 80
(Ala. 1989), awarded $3 million in punitive damages to the plaintiff, whose wife had been burned to death in the defendant's steam room. We affirmed the trial court's order denying a remittitur. More recently, this Court reduced a jury verdict of $15 million in a wrongful death case to $5 million.Burlington Northern R.R. v. Whitt, 575 So.2d 1011. In Whitt, the driver of a tractor-trailer truck was killed when he pulled into the path of an oncoming train.
Based on a thorough review of this case, we are of the opinion that the punitive damages award in this case is excessive and we order a remittitur of $7.5 million. Even though a remittitur is necessary, this Court is of the opinion that the evidence supports a punitive damages award of $7.5 million. We therefore affirm the judgment of the trial court as to the punitive damages award on the acceptance of a remittitur of $7.5 million by the plaintiff Johnston within 28 days of the date of this opinion (January 24, 1992), which will result in a judgment in her favor of $7.5 million.
Accordingly, as to the award of $15 million in punitive damages, the judgment is affirmed, conditioned upon the plaintiff Johnston's acceptance of a remittitur of $7.5 million as herein ordered. As to the award of $75,000 in compensatory damages to Ford Lewis, the judgment is affirmed.
AFFIRMED IN PART; AFFIRMED IN PART CONDITIONALLY.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, STEAGALL and INGRAM, JJ., concur. *Page 1065