630 So.2d 1018 (1993)
SEARS, ROEBUCK AND COMPANY and State Industries, Inc.
v.
Annie HARRIS, as administratrix of the Estate of Joyce Simpson, deceased, et al.
1911519.
Supreme Court of Alabama.
September 10, 1993.
As Modified on Denial of Rehearing January 7, 1994.
*1021 Lyman H. Harris, Susan Rogers and Lawrence T. King of Harris, Evans, Berg, Morris & Rogers, P.C., Birmingham, for appellants.
Tyrone C. Means and H. Lewis Gillis of Thomas, Means & Gillis and Jere L. Beasley, Frank M. Wilson and J. Greg Allen of Beasley, Wilson, Allen, Main & Crow, P.C., Montgomery, for appellees.
Michael D. Knight of Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, and Andrew L. Frey, Evan M. Tager and Katherine J. Henry of Mayer, Brown, & Platt, Washington, DC, for amici curiae Chamber of Commerce of U.S., Nat. Ass'n of Mfrs. and Product Liability Advisory Council, Inc.
Forrest S. Latta, Carr & Alford, P.C., Mobile for amicus curiae Business Council of Alabama.
Davis Carr of Pierce, Carr & Alford, Mobile, and J. Mark Hart of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, for amicus curiae Alabama Defense Lawyers Ass'n.
ALMON, Justice.
The defendants Sears, Roebuck and Company and State Industries, Inc., appeal from a $12,000,000 judgment entered on verdicts in favor of the five plaintiffs in a products liability action. The plaintiffs are Ruth McCord; Louisiana Waddell; and Annie Harris, who sued as administratrix of the estate of her deceased minor daughter Joyce Simpson and as next friend and mother of her minor children Felicia D. Simpson and *1022 Janice D. Simpson.[1] On December 17, 1989, Joyce Simpson died and Louisiana Waddell, Felicia Simpson, and Janice Simpson suffered personal injuries from carbon monoxide poisoning while they slept in Ruth McCord's mobile home. The plaintiffs brought a wrongful death and personal injury action based on the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") and on negligent- and/or wanton-failure-to-warn theories, alleging that a defective Kenmore II gas water heater manufactured by State Industries and sold by Sears, Roebuck and Company caused the carbon monoxide poisoning.

ISSUES
The principal issues, broadly stated, are (1) Whether the plaintiffs presented substantial evidence that the water heater was the actual cause of the death and injuries suffered by the plaintiffs and their decedent; (2) Whether, as a matter of law, the water heater was substantially altered between the date of sale and the date of the accident; (3) Whether the evidence supports a finding that the improper installation of the water heater was a foreseeable misuse of the product; (4) Whether there was substantial evidence that the failure to provide adequate warnings on the water heater proximately caused the death and injuries suffered by the plaintiffs and their decedent; (5) Whether the trial court erred to reversal in allowing testimony of similar accidents to prove notice of the risk of harm caused by defects in the water heater; (6) Whether the plaintiffs presented clear and convincing evidence of wantonness; and (7) Whether the awards of compensatory and punitive damages are due to be set aside on the ground that they are excessive.

FACTS
State Industries manufactured the Kenmore II gas water heater for Sears in 1981. Sears approved the design and all labelling. Sears and State Industries designed and marketed the water heater so that consumers could install it themselves. A label on the water heater stated, "Let Sears Arrange Installation ... or you can install it yourself." The water heater was designed for use with natural gas. The water heater, however, would burn liquid propane ("LP") gas, and nothing in its design prevented the consumer from connecting it to an LP gas line. The use of LP gas in an appliance designed for use with natural gas produces unusually large amounts of carbon monoxide because of incomplete combustion of the LP gas.
The water heater came with a 15-page instruction manual inserted in a plastic pouch, which was attached to the water heater by a piece of adhesive tape. In the manual were instructions telling users how to install the water heater properly. According to the manual, proper installation included, among other things, venting the water heater by means of a pipe extending from the draft hood of the water heater to the outdoors. Fitted to the top of the water heater, the draft hood covered the flue outlet and collected exhaust gases, which were conveyed through the flue from the combustion chamber at the base of the water heater.
In addition to this manual, the water heater itself had labels containing warnings and instructions for ensuring proper clearance from surrounding walls in closet or alcove installation and containing instructions for lighting the water heater's pilot light. The *1023 alcove and closet installation label made several references to the instruction manual and stated that the water heater should be installed in accordance with applicable local codes.
None of the labelling on the water heater warned of the dangers of carbon monoxide poisoning or explained the necessity of venting the water heater. Also, none of the labelling specifically informed the consumer that the water heater was to be used only with natural gas, and, consequently, not with liquid propane gas. One label, however, displaying sundry specifications of the water heater, such as capacity, water pressure, etc., stated "Equipped for NAT." The "Energy-Guide" label also stated that its estimates of the water heater's annual cost of use were "based on a national average of NATURAL."
The water heater in this case was originally purchased from Sears in 1984 by Sam Ferlisi. After properly installing it himself and using it for a brief period in his gasoline service station, Ferlisi stored it for several years in his garage. Ferlisi subsequently gave the water heater to Ruth McCord. In November 1989, Ruth McCord had her grandson Dexter McCord install the water heater in the double-wide mobile home she shared with her great-granddaughters. When Dexter McCord installed the water heater, the instruction manual was missing. Missing also were the draft hood and the inner and outer doors to the combustion chamber, which were designed to cover the opening to the combustion chamber and to be removable in order to allow users to light the water heater pilot light. Ruth McCord's mobile home was originally equipped with a small electric water heater located in a narrow closet in one of the bathrooms. After removing the electric water heater, Dexter McCord installed the gas water heater and connected it to an LP gas tank. He also installed the water heater without a pipe to vent carbon monoxide and other exhaust gases outside the mobile home. At trial, Dexter McCord testified that when he installed the water heater he did not know that gas water heaters required venting. He also stated that he did not know the difference between natural gas and LP gas.
On December 17, 1989, Louisiana Waddell and her three grandchildren, Joyce Simpson, Janice Simpson, and Felicia Simpson spent the night in Ruth McCord's mobile home. Ruth McCord was not present, because she had been admitted to a hospital on December 14, 1989, for a health problem apparently unrelated to this case. The next morning Dexter McCord found Louisiana, Joyce, and Janice unconscious, with their eyes rolled back in their heads and foam around their mouths. Felicia's eyes were open and appeared normal, but she was unresponsive and she too was foaming at the mouth. The four were taken to various hospitals and treated for severe carbon monoxide poisoning.[2] Joyce Simpson subsequently died. Three days later, Barnie Gilliland, an inspector with the Alabama Liquified Petroleum Gas Board, investigated the accident. Gilliland testified at trial that after his investigation he prepared an accident report, and that in it he concluded that the natural gas water heater was improperly installed and that the improper installation caused the injuries and the death.
During the trial, Sears and State Industries sought to prove that the water heater was not lit on the night the accident occurred. Danny Register, an employee of the Highland Home Propane Gas Company, testified that he had made a service call to the mobile home on December 16, the day before the accident. According to Register, none of the family was home. Register stated that a neighbor let him in and that before he left he turned off the gas to Ruth McCord's mobile home at the LP tank. To rebut Register's testimony, the plaintiffs introduced circumstantial evidence that the trailer was locked on December 16, 1989, and that only Louisiana *1024 Waddell and Dexter McCord had keys to the trailer. Louisiana Waddell also testified that on the night of the accident she cooked with the gas stove, which was connected to the same LP gas tank.
The plaintiffs' complaint contained three counts: (1) violation of AEMLD, (2) negligence, and (3) wantonness, all based on the design, manufacture, labelling, distribution, and/or sale of the water heater.
To prove the AEMLD claim, the plaintiffs produced an expert, Wayne McCain, who testified that the water heater was defective or unreasonably dangerous in three respects. First, McCain stated his opinion that the water heater was defective because it violated the American National Standards Institute ("ANSI") standard 1.27.1. McCain stated that ANSI 1.27.1 (1975) required that an installation and instruction manual be permanently attached to the water heater. According to McCain, the fact that the pouch containing the manual was only taped to the water heater violated ANSI standards and made the water heater unreasonably dangerous. Second, McCain stated that the water heater was defective because it did not have either a carbon monoxide sensor or a carbon monoxide shut-off device. These devices, McCain testified, were commercially available at the time the water heater was designed and manufactured. McCain also stated that either of these devices would have prevented the accident by either sounding an alarm or shutting off the water heater when it detected certain levels of carbon monoxide. Third, McCain testified that the water heater was defective because the labelling on the water heater failed to instruct users to vent the water heater and to connect it to natural gas, and not LP gas, and failed to warn users of the hazards of carbon monoxide poisoning.
To prove their related wanton- or negligent-failure-to-warn claims, the plaintiffs introduced McCain's expert testimony. McCain stated that in his opinion the labelling on the water heater inadequately apprised users of the need to vent the water heater and connect it to natural gas, and not LP gas, and that the labelling failed to warn of the dangers of carbon monoxide poisoning.
To prove wantonness, the plaintiffs presented the testimony of McCain and Clifford Carlton, a senior product engineer for State Industries, and other evidence to show that when the water heater was designed and manufactured, both Sears and State Industries knew that consumers were dying or otherwise suffering injuries from carbon monoxide poisoning caused by the failure to vent gas water heaters properly.
For their defense, Sears and State Industries presented evidence that the water heater was not the source of the carbon monoxide gas and introduced expert testimony indicating that the water heater was not defective when made and that it had been substantially altered. The defendants also raised the affirmative defense of product misuse.
The trial court entered a $12,000,000 judgment on a jury verdict in favor of the plaintiffs, awarding the following amounts in compensatory and punitive damages:

Annie Harris, as administratrix $4,000,000 (Wrongful Death)
of the estate
of Joyce Simpson
Felicia Simpson $2,000,000 (Compensatory)
 $1,000,000 (Punitive)
Janice Simpson $ 750,000 (Compensatory)
 $ 250,000 (Punitive)
Louisiana Waddell $2,000,000 (Compensatory)
 $1,000,000 (Punitive)
Ruth McCord $ 750,000 (Compensatory)
 $ 250,000 (Punitive)
 _______________________________
 Total $12,000,000

The trial court denied Sears and State Industries' post-judgment motion for J.N.O.V., or, in the alternative, for a new trial or remittitur, and made findings pursuant to Hammond v. City of Gadsden, 493 So.2d 1374 (Ala.1986), and Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).

DISCUSSION
Because many of the major issues in this case concern the sufficiency of the evidence and the preservation of sufficiency questions for appellate review, we begin our discussion with a general review of the applicable principles of law.
Rule 50(b), Ala.R.Civ.P., provides a specific procedure for challenging the sufficiency of the evidence:
"Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination *1025 of the legal questions raised by the motion. Not later than 30 days after entry of judgment, a party who has moved for a directed verdict may file a motion to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict...."
Id. In accordance with this procedure is the well-settled rule "that a motion for a directed verdict must be made at the close of all the evidence and that a timely post-trial motion for judgment notwithstanding the verdict must be subsequently made before an appellate court may consider on appeal the insufficiency-of-evidence issue directed to the jury's verdict." Bains v. Jameson, 507 So.2d 504, 505 (Ala.1987); see also Great Atlantic & Pacific Tea Co. v. Sealy, 374 So.2d 877 (Ala. 1979); Black v. Black, 469 So.2d 1288 (Ala. 1985); Housing Auth. of the City of Prichard v. Malloy, 341 So.2d 708 (Ala.1977). "The motion for a directed verdict may be oral even though the better practice dictates a written motion for the sake of clarity and to prevent misunderstanding." Pettway v. Pepsi Cola Bottling Co., 337 So.2d 757, 759 (Ala. 1976); see Lawrence v. Lackey, 451 So.2d 278 (Ala.1984).
If a sufficiency issue has been properly raised and preserved, the standard of review applicable to a motion for J.N.O.V. is identical to the standard used by the trial court in ruling on a directed verdict motion. John R. Cowley & Bros., Inc. v. Brown, 569 So.2d 375 (Ala.1990); Alpine Bay Resorts, Inc. v. Wyatt, 539 So.2d 160 (Ala.1988). Like a directed verdict, a J.N.O.V. is proper when the party with the burden of presenting evidence has failed to present "substantial evidence" in support of its position. John R. Cowley & Bros, Inc. v. Brown, supra; § 12-21-12(a), (c), Ala.Code 1975. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). In ruling on a motion for a directed verdict or for a J.N.O.V., the court views the entire evidence and makes all reasonable inferences therefrom in favor of the nonmoving party. Pickett v. United States Steel Corp., 495 So.2d 572 (Ala.1986).

Causation in Fact
Because it relates to all of the plaintiffs' claims, we begin our discussion of the merits of this case by addressing the issue of causation. The issue raised by Sears and State Industries is whether the trial court erred in not directing a verdict on all claims on the basis that the plaintiffs failed to prove that the water heater was lit and working at the time of the accident.
The plaintiffs argue initially that the defendants failed to preserve this issue for appellate review. The plaintiffs contend that although the defendants' motion for J.N.O.V. specifically raised this issue, their motion for a directed verdict at the close of all of the evidence did not.
After renewing, at the close of all the evidence, the motion for a directed verdict they filed at the close of the plaintiffs' evidence, Sears and State Industries made a second, oral motion for directed verdict on the specific ground that the plaintiffs had presented no evidence that the pilot light on the water heater was lit on the night of the accident. The record also shows that in accordance with the procedure of Rule 50, Ala. R.Civ.P., the defendants properly renewed their motion for a directed verdict on this ground when they filed their post-judgment motion for J.N.O.V. We conclude, therefore, that this issue has been properly preserved for our review.
Sears and State Industries argue that the trial court erred in not directing a verdict in their favor on all counts because it is undisputed, they say, that on December 16, 1989, Danny Register cut off the supply of gas to the mobile home at the tank after inspecting for gas leaks and that no one relit the pilot light on the water heater before the accident. Undeniably, the defendants say, the source of the carbon monoxide was not the water heater. In all likelihood, they contend, the source was the gas stove, which, they say, the McCord family was using to heat the mobile home.
We note initially that because it was undisputed that carbon monoxide poisoning caused *1026 the injuries and the death, the critical factual determination is the source of the carbon monoxide. Viewing the evidence and all reasonable inferences therefrom in favor of the plaintiffs, we hold that Gilliland's trial testimony concerning the conclusions of the accident report he prepared and the considerable amount of circumstantial evidence presented by plaintiffs constitute substantial evidence from which a fair-minded person could reasonably infer that the water heater was the source of the carbon monoxide that caused the injuries and the death. The argument advanced by Sears and State Industries mistakenly assumes that because the plaintiffs were not able to dispute Danny Register's testimony with direct evidence, they did not present any substantial evidence to establish causation.
Although Sears and State Industries challenged the reliability of Gilliland's conclusions in the accident report, Gilliland's testimony regarding those conclusions constitutes evidence of such weight and quality that a reasonable trier of fact could infer that the water heater emitted the carbon monoxide that caused the injuries. Moreover, the extensive circumstantial evidence presented by the plaintiffs not only established an inference of causation; it also rebutted and challenged the credibility of the testimony of Danny Register, who was an employee of Highland Home Propane Gas Company, a defendant originally named in this action.[3]
First, there was testimony from McCord family members that, contrary to his testimony, Danny Register could not have entered the locked mobile home on December 16 when the McCord family was not at home. Although Danny Register stated that a neighbor, whom he could not later identify or remember, with a key let him into the mobile home to inspect it for leaking gas, Louisiana Waddell testified that she and Dexter McCord were the only people who had keys to the mobile home. Second, members of the McCord family testified that no one relit the pilot light on the gas stove after December 16, and Louisiana Waddell testified that after cooking dinner on the gas stove the evening of December 17, she turned off the burners she had used.
Third, the plaintiffs presented circumstantial evidence creating an inference that the water heater was the only gas appliance operating in the mobile home on the evening of the accident. Ruth McCord's mobile home had four fuel-burning appliances: a kerosene heater, a gas furnace, a gas stove, and the water heater. It was undisputed that neither the kerosene heater nor the furnace was being used at the time of the accident. The only two possible sources of carbon monoxide, therefore, were the gas stove and the water heater. Because Louisiana Waddell testified that she turned the stove off after cooking with it on the evening of the accident, a fair-minded person could reasonably infer that the water heater was the only possible source of the carbon monoxide and thus was the cause in fact of the injuries and death.
After carefully reviewing the record, we cannot say that the plaintiffs failed to present an issue of fact for the jury. In fact, in light of the disparate, conflicting evidence presented, we think the question of causation in this case is precisely the kind of question that is properly within province of the jury.

AEMLD Claim
In Kelly v. M. Trigg Enterprises, Inc., 605 So.2d 1185, 1191 (Ala.1992), the Court restated the elements of an AEMLD claim established in Casrell v. Altec Indus., Inc., 335 So.2d 128, 132-33 (Ala.1976), and Atkins v. American Motors Corp., 335 So.2d 134, 141 (Ala.1976):
"`To establish liability, a plaintiff must show:
"`(1) he suffered injury or damages to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
"`(a) the seller is engaged in the business of selling such a product, and
"`(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

*1027 "`(2) Showing these elements, the plaintiff has proved a prima facie case although
"`(a) the seller has exercised all possible care in the preparation and sale of his product, and
"`(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.'"
605 So.2d at 1191; see also Yamaha Motor Co. v. Thornton, 579 So.2d 619, 621 (Ala. 1991).
The first issue that Sears and State Industries state in regard to the plaintiffs' AEMLD claim is whether the trial court erred in not directing a verdict for the defendant on the basis that the plaintiffs failed to prove that the lack of a carbon monoxide detector or shut-off device rendered the water heater defective.
The plaintiffs argue initially that the defendants failed to raise this issue in the trial court and therefore cannot raise it now on appeal. After meticulously examining the record, we agree. Although Sears and State Industries presented expert testimony and other evidence to rebut the testimony of Wayne McCain that the failure to include various safety devices in the water heater's design rendered it defective, they did not raise an issue of the sufficiency of the plaintiffs' evidence, either in their written and oral motions for directed verdict at the close of the evidence or in their post-judgment motion for J.N.O.V. The defendants' motion for J.N.O.V., or, in the alternative, a new trial or remittitur contained 57 assignments of error; not one of them related to the sufficiency of the plaintiffs' evidence on this issue of defectiveness. We hold, therefore, that the defendants waived appellate review of this issue.
The second AEMLD issue is whether the trial court erred in not directing a verdict for the defendants on the basis that the plaintiffs failed to prove that the condition of the water heater had not been substantially altered between the date of sale and the date of the accident.
Sears and State Industries argue that undisputed evidence shows that when the water heater was installed its draft hood and vent pipe, the inner and outer access doors to the combustion chamber, and the plastic pouch containing the instruction manual were missing. Therefore, the defendants contend, the plaintiffs failed to carry their burden of establishing that the water heater had not been substantially altered between its purchase and the time of the accident.
The plaintiffs respond by arguing that they met their burden of production either because, they say, the alterations did not cause the accident or because the alterations were reasonably foreseeable to Sears and State Industries. It was foreseeable, the plaintiffs say, that the pouch containing the instruction manual, as well as the draft hood and vent pipe, would be removed from the water heater. The plaintiffs also argue that it was foreseeable that such alterations to the condition of the water heater would cause the injuries and death.
An essential element of an AEMLD claim is proof that the product reached the consumer without substantial change in the condition in which it was sold. Clarke Indus., Inc. v. Home Indemn. Co., 591 So.2d 458, 462 (Ala.1991); see also Caterpillar Tractor Co. v. Ford, 406 So.2d 854 (Ala.1981). However, the mere fact that a product has been altered or modified does not necessarily relieve the manufacturer or seller of liability. Johnson v. Niagara Machine & Tool Works, 555 So.2d 88, 91 (Ala.1989). A manufacturer or seller remains liable if the alteration or modification did not in fact cause the injury, Johnson, 555 So.2d at 91 (quoting Industrial Chem. & Fiberglass Corp. v. Hartford Acc. & Indemn. Co., 475 So.2d 472, 476 (Ala.1985)); Bullen v. Roto Finishing Systems, 435 So.2d 1256 (Ala.1983); Brown v. Terry, 375 So.2d 457 (Ala.1979), or if the alteration or modification was reasonably foreseeable to the manufacturer or seller. Clarke Indus., 591 So.2d at 462; Beloit Corp. v. Harrell, 339 So.2d 992 (Ala.1976).
After reviewing the record and examining the exhibits[4] in a light most favorable to the *1028 plaintiffs and after drawing all reasonable inferences in their favor, we hold that the changes in the water heater either were not substantial alterations or, if they were substantial alterations, were foreseeable. First, the evidence shows that the vent pipe was not sold with the water heater. The instruction manual states that the customer must provide his own vent pipe. Therefore, the absence of a vent pipe cannot be a substantial alteration of the product. Second, substantial evidence shows that the instruction manual, the draft hood, and the doors to the combustion chamber were detachable and easily removed. When the water heater was originally sold, the instruction manual was contained in a plastic pouch affixed to the water heater by adhesive tape. The draft hood was attached by slipping tabs located on the legs of the draft hood into holes placed in the jacket top covering the top of the water heater. Likewise, the inner and outer doors to the combustion chamber were affixed by slipping tabs on the doors into holes located in the combustion chamber aperture. The doors appear to have been designed to be removable, in order to allow easy lighting of the pilot light. Moreover, although the defendant's expert testified that the doors were important safety devices, there was no evidence that the absence of these doors was a cause of the accident. Thus, the removal of the manual, the draft hood, and the doors was a foreseeable alteration of the water heater.
For the foregoing reasons, the trial court did not err in denying the motions for a directed verdict on the basis of a substantial alteration of the product.
The third issue raised with regard to the plaintiffs' AEMLD claim is whether the trial court erred in not directing a verdict for the defendants based on the affirmative defense of product misuse.
Sears and State Industries argue first that the facts are undisputed that the plaintiffs failed to carry their burden of proving, as part of their prima facie case, that the water heater was used as intended by the manufacturer. The defendants contend that because the water heater was improperly installed, the product was not used as intended and that it was the improper installation, not any alleged defect, that proximately caused the injuries and the death.
Contrary to the contention of Sears and State Industries, proof that a product was used as intended is not an element of a prima facie case under the AEMLD. In Kelly, supra, the Court recently reaffirmed the rule that a user's misuse of an allegedly defective product is an affirmative defense to liability under the AEMLD, which the defendant must plead and prove. 605 So.2d at 1192; see also Banner Welders, Inc. v. Knighton, 425 So.2d 441, 448 (Ala.1982); McCaleb v. Mackey Paint Mfg Co., 343 So.2d 511, 514 (Ala.1977); Atkins v. American Motors Corp., 335 So.2d 134 (Ala.1976). Therefore, the plaintiffs did not have the burden of proving either that they properly installed the water heater or, more generally, that they used the water heater as intended by the manufacturer. However, because the defendants submitted evidence and moved for a directed verdict on this affirmative defense, the plaintiffs were required to present substantial evidence that the water heater was not misused or that the misuse was reasonably foreseeable. § 12-21-12, Ala.Code 1975.
"`When asserting misuse as a defense under AEMLD, the defendant must establish that the plaintiff used the product in some manner different from that intended by the manufacturer. Stated differently, the plaintiff's misuse of the product must not have been "reasonably foreseeable by the seller or manufacturer."'" Kelly, 605 So.2d at 1192 (quoting Edward C. Martin, Alabama's Extended Manufacturer's Liability Doctrine (AEMLD), 13 Am.J.Trial Advoc. 983, 1040 (1990)). Ordinarily, the plaintiff's misuse of an allegedly defective product is a factual issue for the jury. Kelly, 605 So.2d at 1192; Banner Welders, Inc., 425 So.2d at 448; Beloit Corp. v. Harrell, 339 So.2d 992, 997 (Ala.1976). Thus, although the appellants correctly assert that Dexter McCord did not use the water heater as intended when he improperly installed it, the inquiry under our law does not end here. The question is whether this misuse of the product was reasonably foreseeable by Sears and State Industries.
*1029 Evidence that the plaintiffs introduced to prove wantonness is particularly relevant to the issue of foreseeability presented here. First, McCain testified that in 1980 it was generally known that vent failures occurred and that people could be killed by carbon monoxide poisoning as a result of such vent failures. McCain also testified that he himself was aware of several cases arising before 1984 in which a Kenmore II gas water heater had been inadequately vented and connected to LP gas and had caused injury. Second, to prove notice or knowledge on the part of Sears and State Industries, the plaintiffs introduced, as exhibits, copies of a complaint and a summons from a wrongful death action filed against Sears and State Industries in August 1982. The complaint alleged that Sears and State Industries had breached express and implied warranties by failing to give adequate instructions and warnings regarding the dangers of carbon monoxide poisoning caused by connecting a Kenmore gas heater to LP gas. Third, Clifford Carlton, a senior product engineer with State Industries, testified, as an adverse witness, that when the water heater was being designed and manufactured, State Industries knew that consumers were being injured and killed by carbon monoxide poisoning as a result of improper installation:
"Q. Y'all were aware that folks were being killed by gas appliances, weren't you?
"A. Correct.
"Q. And you knew that y'all were in the water heater business using gas to fuel those water heaters?
"A. Correct.
"Q. And you knew that some folks were being killed because of the gas water heaters putting out carbon monoxide, didn't you?
"A. Improper installation, yes.
"Q. Did you ever ask anyyou knew at that time that people were installing them wrong, sir?
"A. Could.
"Q. They
"A. People can.
"Q. They can?
"A. Yes.
"Q. And y'all knew as far back as the time this was done, that you put this one together and designed it? Sir?
"Are you telling this jury that your company knew back before this water heater was designed and manufactured that people out there were not putting them in like y'all wanted them to, or Sears, and carbon monoxide poisoning was resulting, and folks were getting killed. Y'all knew it back then, didn't you?
"A. I suppose so."
We hold that the plaintiffs presented substantial evidence to prove that when State Industries and Sears designed, manufactured, and distributed the Kenmore II gas water heater, it was reasonably foreseeable that consumers would improperly install it by connecting it to LP gas and failing to vent it properly.
Sears and State Industries' second "product misuse" argument is that the improper installation was an unforeseeable misuse, as a matter of law, because the installation constituted a violation of a regulation promulgated by the Alabama Liquified Petroleum Gas Board.
We pretermit, however, all consideration of this issue because Sears and State Industries make no legal argument beyond bare allegation and cite no legal authority, other than the applicable LP Gas Board regulation, for the asserted proposition that an improper installation of the heater by either a plaintiff or a third party constitutes, as a matter of law, an unforeseeable misuse because the improper installation was a criminally punishable violation of a state administrative regulation. Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288 (Ala.1993); Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990); Henderson v. Alabama A & M Univ., 483 So.2d 392 (Ala.1986).

Negligent-/Wanton-Failure-to-Warn Claim
Regarding the plaintiffs' negligent- or wanton-failure-to-warn claim, Sears and State Industries raise the issue of whether the trial court erred in not directing a verdict for the defendants on the basis that the plaintiffs failed to prove that Dexter McCord *1030 would have read additional warnings. This issue bears on the element of proximate causation.
Proximate causation is an essential element of a prima facie case of either negligent or wanton failure to adequately warn. Gurley v. American Honda Motor Co., 505 So.2d 358, 361 (Ala.1987); see also Deere & Co. v. Grose, 586 So.2d 196, 198 (Ala.1991). A negligent- or wanton-failure-to-warn claim cannot be submitted to a jury unless there is substantial evidence that the allegedly inadequate warning would have been read and heeded and that it would have prevented the accident. Precise Engineering, Inc. v. LaCombe, 624 So.2d 1339 (Ala. 1993); Clarke Indus., Inc. v. Home Indem. Co., 591 So.2d 458, 461-62 (Ala.1991); Deere & Co., 586 So.2d at 198; Gurley, 505 So.2d at 361; E.R. Squibb & Sons, Inc. v. Cox, 477 So.2d 963, 971 (Ala.1985).
Citing Kelly v. M. Trigg Enterprises, Inc., supra, Deere & Co., supra, and E.R. Squibb & Sons, Inc., supra, Sears and State Industries argue that because Dexter McCord's testimony indicates that he only "looked over" the labels on the water heater, the plaintiffs failed to present substantial evidence that he would have read the warnings that the plaintiffs allege should have been placed on the water heater.
Although Dexter McCord testified that he did not read all the labels on the water heater, he did testify that he read most of them. Dexter McCord recalled reading a label saying "Let Sears Arrange Installation... or you can do it yourself," a label containing the operating instructions (which included instructions on how to light the pilot light), and a label giving instructions regarding minimum clearance for alcove installation. In addition, Dexter McCord read a label containing information, such as the water heater's serial number, model number, maximum hydrostatic pressure, gas pressure, and capacity. Dexter McCord also testified that after installing the water heater he followed the instructions on the operating instructions label when he lit the pilot light.
After reviewing the record in a light most favorable to the plaintiffs and making all reasonable inferences in their favor, this Court concludes that the plaintiffs presented sufficient evidence for the jury to reasonably infer that Dexter McCord would have read additional warning labels had Sears and State Industries provided them. The labels that Dexter McCord testified to reading constitute all the existing labels that were, practically speaking, relevant to installing and operating the water heater safely. Moreover, the fact that Dexter McCord followed the directions for lighting the pilot light included on the operating instructions label also created an inference that he would have followed additional instructions and warnings.
As to the cases cited by Sears and State Industries, we find them distinguishable. Unlike the plaintiffs in this case, the plaintiff in Deere & Co. presented absolutely no evidence to show that the allegedly inadequate warning in the owner's manual proximately caused the plaintiff's injuries. Similarly, in Kelly and E.R. Squibb & Sons, Inc., the undisputed evidence showed that the plaintiff did not read any of the instructions or warnings furnished with the product.

Evidence of Similar Accidents
The only evidentiary issue Sears and State Industries raise in their brief is whether the trial court reversibly erred in allowing plaintiffs' counsel to question McCain about other accidents involving Kenmore II Sears water heaters without, according to Sears and State Industries, laying a proper foundation.
During direct examination, plaintiffs' counsel asked McCain if he was familiar with any cases prior to 1984 in which a Sears Kenmore II water heater had been inadequately vented and connected to LP gas. When McCain replied that he was, defense counsel objected:
"Q. Are you familiar with any cases prior to 1984 where a water heater, a Kenmore II water heater was inadequately vented and connected to LP gas?
"A. Yes, Sir.
"MR. HARTLEY: Objection, Judge.
"THE COURT: What's the grounds?

*1031 "MR. HARTLEY: Asking for specific cases.
"THE COURT: He didn't ask him for a specific case. He just asked him if he knew if there were any."
Counsel for Sears and State Industries made no other argument in support of this objection. It is clear from the context of this testimony that the plaintiffs were attempting to prove notice and foreseeability.
In their brief to this Court, the defendants argue that it was reversible error for the trial court to allow this questioning without requiring a foundation showing that the other cases arose from "substantially similar circumstances." Ordinarily, to prove notice of a defective condition of a product by establishing other, prior accidents, a party must lay a predicate showing that the products that caused the other accidents were in substantially the same condition as the product that is the subject of the action. See General Motors Corp. v. Johnston, 592 So.2d 1054, 1058-59 (Ala.1992). See generally C. Gamble, McElroy's Alabama Evidence § 64.04 (4th ed. 1991).
We hold, however, that Sears and State Industries waived the issue they now argue, because the ground for exclusion they argue on appeal is not the ground they specified at trial. "`The statement of specific grounds of objection waives all grounds not specified, and the trial court will not be put in error on grounds not assigned at trial.'" B.A.S.S. Coal, Inc. v. Black Warrior Minerals, Inc., 579 So.2d 1325, 1327 (Ala.1991) (quoting Ex parte Frith, 526 So.2d 880, 882 (Ala.1987). From the portion of the transcript quoted above, it appears that the trial court understood defense counsel's objection to be directed at anticipated testimony from McCain regarding the other cases involving Kenmore II water heaters. When the trial court overruled Sears and State Industries' objection by saying that McCain had not been asked about any "specific case," defense counsel did not seek to state or clarify any other basis for their objection. Therefore, we conclude that Sears and State Industries did not object to McCain's testimony on the basis of any failure to lay a predicate showing "substantial similarity." Moreover, even if in the circumstances of this case this testimony was erroneously admitted without a proper predicate, the error would have been harmless, in light of the large amount of evidence introduced by the plaintiffs to prove notice and foreseeability. Rule 45, Ala.R.App.P.

Clear and Convincing Evidence of Wantonness
The first issue raised with regard to the punitive damages verdict is whether the $2,500,000[5] award of punitive damages was supported by clear and convincing evidence of wantonness. The plaintiffs argue that the defendants cannot challenge the punitive damages award on the ground that wantonness was not proved by clear and convincing evidence when they did not raise the issue in their motion for a directed verdict. We disagree.
Although the defendants did not preserve the issue of the sufficiency of the evidence to prove wantonness, they did properly preserve the issue of whether wantonness was proved by clear and convincing evidence for purposes of the punitive damages award, because they raised the issue in their motion for J.N.O.V., or, in the alternative, for a new trial or remittitur.
It is not necessary, before entry of judgment, to object to the absence of clear and convincing evidence of wantonness in order to preserve the issue for appellate review. An objection based on a party's failure to present substantial evidence of wantonness is different from an objection based on a party's failure to prove wantonness by "clear and convincing" evidence. The former relates to the issue of whether a party has presented sufficient evidence to present an issue of fact for the jury; the latter relates to whether a party has proved wantonness by sufficient weight of the evidence to justify *1032 the jury's imposition of punitive damages. The issue of whether an award of punitive damages is supported by clear and convincing evidence necessarily does not arise either until a party requests an instruction on punitive damages or until after the jury renders a verdict and the trial court enters a judgment. Thus, even though Sears and State Industries did not challenge the sufficiency of the evidence on the claims of wantonness, they did properly raise the issue of whether the award of punitive damages was supported by clear and convincing evidence, in their post-judgment motion for J.N.O.V., or, in the alternative, a new trial or remittitur.
In Shoals Ford, Inc. v. Clardy, 588 So.2d 879 (Ala.1991), this Court stated the following applicable principles:
"Whether a defendant's conduct was committed willfully, wantonly, or intentionally is a question for the jury on the issue of punitive damages (Surrency v. Harbison, 489 So.2d 1097 (Ala.1986)), and on appeal there is a presumption of correctness as to the amount of punitive damages awarded by the trier of fact. See Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala.1991) (a case in which this Court declared Ala.Code 1975, § 6-11-23(a), § 6-11-24(a), and the parenthetical portion of § 6-11-24(b) unconstitutional).
"In Ala.Code 1975, § 6-11-20(b)(3), `wantonness' is defined as `conduct which is carried on with a reckless or conscious disregard of the rights and safety of others.' In order to award punitive damages, the wanton conduct must be proven by `clear and convincing evidence,' Ala.Code 1975, § 6-11-20(a), which is defined in § 6-11-20(b)(4) as follows:
"`Evidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion. Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or the substantial weight of the evidence, but less than beyond a reasonable doubt.'"
Id. at 884.
Sears and State Industries argue that imposing $2,500,000 in punitive damages on them was error because, they argue, there was no "clear and convincing evidence" of wantonness. More specifically, they argue that because industry standards did not require a carbon monoxide sensor or a shut-off safety device and because no other manufacturer used them, they had no reason to believe that failure to use them would create an unreasonably dangerous condition.
The evidence introduced by the plaintiffs to prove wantonness, however, belies the defendants' contentions. The plaintiffs presented evidence that the dangers of carbon monoxide poisoning from gas appliances had been generally known in the industry at the time the water heater was designed; that Sears and State Industries had designed, manufactured, marketed, and distributed the Kenmore II gas water heater to be installed by consumers; that Sears and State Industries were actually aware that consumers were misinstalling gas water heaters by connecting them to LP gas and by failing to vent them properly; that Sears and State Industries were actually aware that such improper installation had caused deaths and injuries from carbon monoxide poisoning; that a wrongful death action based on carbon monoxide poisoning caused by connection of a Kenmore II gas water heater to LP gas had been filed against Sears and State Industries in 1981; and that notwithstanding knowledge of these facts, Sears and State Industries did not place any additional warning or instruction labels on the water heater or otherwise alter its design.
Addressing the defendants' more specific contention, we note that adherence to ANSI industry standards does not, in and of itself, relieve a manufacturer from liability for damages based on claims of wantonness, when other evidence clearly and convincingly shows that it knew of the risk of injury and death posed by its products. Cf., King v. National Spa & Pool Institute, Inc., 570 So.2d 612 (Ala.1990). Compliance with such industry standards does not allow a manufacturer *1033 to close its eyes to injuries caused by its products and do nothing to alter their design or to warn users. The same may be said for the defendants' argument that they could not have been wanton because no other manufacturer of gas water heaters employed a carbon monoxide sensor or shut-off device. Moreover, we note that Clifford Carlton admitted at trial that Ernest Wenczl, the chief designer of the Kenmore II water heater and a member of an ANSI subcommittee on standards for gas water heaters, had for many years actively opposed efforts to require the use of carbon monoxide sensors on gas water heaters.
We hold, therefore, that the evidence set out above, together with other evidence in the record, constituted clear and convincing evidence that Sears and State Industries consciously disregarded the rights and safety of the plaintiffs when they designed, manufactured, and distributed the Kenmore II gas water heater.

Due Process Rights
Sears and State Industries challenge the punitive damages awards under the due process clause of the Fourteenth Amendment to the United States Constitution. The two issues they raise are (1) whether the trial court's judgment violates the due process rights of the defendants on the basis that it does not apprise them of the extent of the punishment imposed for their conduct, and (2) whether the trial court's judgment violates the due process rights of the defendants by meting out multiple and differing punishments for a single wrongful act.
We find that the defendants waived these issues when they requested special verdict forms, materially similar to the ones eventually submitted to the jury, asking the jury to return separate awards of punitive damages for each plaintiff, if the jury chose to award punitive damages. Sears and State Industries cannot now on appeal base an argument for reversal on alleged error that they themselves invited. E & S Facilities, Inc. v. Precision Chipper Corp., 565 So.2d 54, 60 (Ala.1990); Phillips v. Anesthesia Servs., P.C., 565 So.2d 127, 129 (Ala.1990); Osborn v. Johns, 468 So.2d 103, 110 (Ala.1985).

Excessiveness of the Jury Verdicts
Sears and State Industries request this Court to condition any affirmance of the judgment on a substantial remittitur of the compensatory and punitive damages awards on the ground that the verdicts are excessive.
Subject to important state constitutional constraints, this Court has the authority under § 12-22-71, Ala.Code 1975, to determine the proper amount of recovery and to affirm the judgment, subject to the filing of a remittitur of the amount in excess of the proper amount, when the Court concludes that the judgment is excessive. The right to a trial by jury is a fundamental, constitutionally guaranteed right, Art. I, § 11, Const.1901, and a jury verdict may not be set aside or remitted unless the verdict is flawed, thereby losing its constitutional protection, Hammond v. City of Gadsden, 493 So.2d 1374, 1378 (Ala.1986), or unless, in the case of a punitive damages verdict, it exceeds the amount necessary, in the particular circumstances of the case, to accomplish society's goals of punishment and deterrence, Green Oil Co. v. Hornsby, 539 So.2d 218 (Ala.1989).
Although Sears and State Industries address their excessiveness-of-the-verdict argument to the particular circumstances of each personal injury plaintiff, their common objection is the absence of severe, long-term or permanent, physical impairment and suffering. As stated by one of the plaintiffs' expert witnesses, Dr. Edwin T. Johnson, individuals may not necessarily suffer long-term effects after being exposed to carbon monoxide gas for an appreciable period. In fact, Dr. Johnson testified, most do not. Although it is true that the plaintiffs' special damages in this case are minor and their long-term symptoms or permanent injuries relatively slight, the Court cannot discount the mental anguish associated with the experience of almost dying of carbon monoxide poisoning in one's sleep. However, after carefully reviewing the evidence, we conclude that the compensatory damages awards are excessive. Therefore, we order the following remittiturs.
First, we order a remittitur of the $750,000 in compensatory damages awarded to Ruth McCord. Although the jury could *1034 have speculated that Ruth McCord suffered from the effects of carbon monoxide poisoning before she entered the hospital on December 14, 1989, the plaintiffs presented no substantial evidence that she suffered any physical injury as a result of exposure to carbon monoxide gas. The only evidence of personal injury presented at trial was Annie Harris's brief testimony that Ruth McCord worried about death, that she suffered mental anguish over the loss of Joyce Simpson and the injuries suffered by McCord's daughter and McCord's other great granddaughters and that after the accident her health worsened. We note that Ruth McCord herself did not testify at trial. In light of the paucity of evidence to support her claim for damages for personal injury, we remit the jury's award of $750,000 in compensatory damages to Ruth McCord to $1.00.[6]
Second, we order a remittitur with regard to the $750,000 in compensatory damages awarded to Janice Simpson. Although Janice suffered from acute carbon monoxide poisoning, her hospital costs amounted to only $1,962, and Dr. Johnson could not specify any long-term effect from the poisoning. Janice testified that she was doing fine physically, had no health problems, and was doing well in school. In light of this evidence, we remit the $750,000 in compensatory damages to $100,000.
Third, we order a remittitur with regard to the $2,000,000 in compensatory damages awarded to Felicia Simpson. Like the others who were in the mobile home, Felicia suffered from acute carbon monoxide poisoning. However, her hospital costs were only $1,202, and the only long-term symptom to which she testified was blurred vision. Dr. Johnson testified that blurred vision was a long-term symptom of carbon monoxide poisoning and that when he examined Felicia, she reported blurred vision in her right eye. However, Dr. Johnson was not certain that carbon monoxide was the cause of Felicia's blurred vision. In light of this evidence, we remit the $2,000,000 award in compensatory damages to $250,000.
Fourth, we order a remittitur with regard to the $2,000,000 in compensatory damages awarded to Louisiana Waddell. As with the other plaintiffs sleeping in the mobile home on the evening of the accident, Louisiana suffered acute carbon monoxide poisoning, which, because of her age and her existing health problems, had lasting effects. The evidence showed that Louisiana incurred approximately $10,000 in hospital expenses and that she suffered from long-term effects of carbon monoxide poisoning. According to Dr. Johnson, the carbon monoxide poisoning aggravated the hypertension for which she had received treatment before the accident. Louisiana complained of continuous headaches, dizziness, nausea, and shortness of breath, which restricted her movement. In light of this evidence, we remit the $2,000,000 award of compensatory damages to $500,000.
We now turn our attention to the $2,500,000 in punitive damages awarded in the three personal injury claims and the $4,000,000 in wrongful death damages. The considerations that inform our analysis of the defendants' contention that the punitive damages awards are excessive differ somewhat from those that guided our analysis of the compensatory damages awards. When excessiveness of punitive damages is the issue, the focus of our review is not on the plaintiff's injuries, but, rather, is on the reprehensibility of the defendant's conduct. General Motors Corp. v. Johnston, 592 So.2d 1054, 1063 (Ala.1992). In compliance with the procedures mandated by Hammond and Green Oil, the inquiry is whether the amount of punitive damages awarded exceeds the amount necessary to accomplish society's goals of punishment and deterrence. Green Oil, 539 So.2d at 218.
After thoroughly reviewing the evidence in this case, we conclude that the punitive damages awards were not excessive. Sears and State Industries specifically designed the Kenmore II gas water heaters to allow users to install them themselves. By so marketing the Kenmore II, the defendants came under *1035 a legal duty to anticipate reasonably foreseeable ways in which consumers would misinstall their product and injure themselves and to change its design to eliminate the risks associated with such misuses or to adequately warn consumers of those risks. The plaintiffs convincingly showed that, even though the defendants were clearly aware that some consumers were misinstalling their gas water heaters and suffering death or serious injuries, they did nothing to alter the design or labelling of their product. Therefore, in light of the reprehensibility of Sears and State Industries' wanton conduct and the extreme risk of injury or death that conduct created, we cannot say that the punitive damages awards were excessive.
Moreover, we note that the amount of the punitive damages awarded in this case is not inconsistent with the amounts of other punitive damages awards affirmed by this Court. E.g., Atkins v. Lee, 603 So.2d 937 (Ala.1992) ($6,875,000 wrongful death award affirmed); General Motors Corp. v. Johnston, 592 So.2d 1054 (Ala.1992) (judgment affirmed, conditioned on remittitur of $7,500,000 of jury's $15,000,000 wrongful death award); Industrial Chem. & Fiberglass Corp. v. Chandler, 547 So.2d 812 (Ala.1988) ($5,000,000 punitive damages award affirmed).
Based on the foregoing, the judgment is therefore affirmed, conditioned upon remittitur, as indicated above. The plaintiffs shall, within 30 days after the date of this opinion, file a remittitur, pursuant to § 12-22-71, Ala. Code 1975, reducing the total judgment as ordered herein; otherwise, this judgment will stand reversed and the cause remanded for a new trial.
AFFIRMED CONDITIONALLY.
HORNSBY, C.J.,[*] and MADDOX, SHORES, ADAMS, STEAGALL and INGRAM, JJ., concur.
HOUSTON, J., dissents in part and concurs in part conditionally to affirm.
HOUSTON, Justice (dissenting in part; concurring in part conditionally to affirm).
I write only to express my concern about the inconsistent punitive damages verdicts.
Sears and State Industries were punished to the extent of $4,000,000 for the single act or omission giving rise to liability on the claim of Ms. Harris for the death of Joyce Simpson. For this same act or omission giving rise to liability, Sears and State Industries were punished by an award of $1,000,000 on the claim of Felicia Diane Simpson and by an award of $1,000,000 on the claim of Louisiana Waddell; and to further complicate this matter, for this same act or omission giving rise to liability, Sears and State Industries were punished by an award of only $250,000 on the claim of Janice Denise Simpson and by an award of only $250,000 on the claim of Ruth McCord. The same act or omission giving rise to liability occurred in each case.
The following is the entire jury charge as it relates to punitive damages:
"You take the law as the Court gives it to you and apply it to the facts as you determine them to be in arriving at your verdict....
"All of those claims [five different claims] are made on the grounds that the defendants ... were negligent or wanton in their conduct....
"... [T]he plaintiffs also complained that ... the defendants acted wantonly.
"[The court defined wantonness and willfulness.]
"... Ms. Harris has a claim ... under the wrongful death act for the wrongful death of Joyce and the law says that in a suit brought for wrongful acts, omission, or negligence causing the death or damages recoverable [sic]. Damages recoverable are punitive not compensatory.
"Damages in this type action are entirely punitive imposed for the preservation of human life and as a deterrent to others to prevent similar wrong. The amount of damages should be directly related to the *1036 amount of wrongdoing on the part of the defendant.
"In assessing damages you are not to consider the monetary value of the deceased. For damages of this type of action are not recoverable to compensate the family for theof the deceased from a monetary standpoint on account of her death nor to compensate the plaintiff for any financial loss sustained by her for the family of the deceased on account of the death.
"Your verdict ... should be directly related to the culpability of the defendants and necessity for preventing similar wrong in the future.
"....
"Punitive damages are allowed to the plaintiff and may be awarded in the sound discretion of the jury in cases where the plaintiff reasonably satisfies the jury from the evidence that the plaintiff has been willful [sic] or wantonly injured by the defendant.
"....
"Now, so far as the matter of punitive damages is concerned, punitive damages, as you will recall I told you, could be awarded in your discretion where you find that the Defendants have been guilty of wanton conduct or in a wrongful death case.
"And the law says the matter of punitive damages is set out in the Code of Alabama in Section 6-11-20 and in its pertinent parts it reads as follows:
"`Punitive damages may not be awarded in any civil action except actions for wrongful death other than tort actions where it is proven by clear and convincing evidence that the Defendant consciously or deliberately engaged in oppression, wantonness or malice with regard to the Plaintiff.'
"Now, as it is used in that statement wantonness is conduct which is carried on in a reckless or conscious disregard for the rights of others.
"The right to punitive damages must be... shown by clear and convincing evidence. Evidence that wouldclear and convincing evidence that would weigh againstwhen weighed against evidence in opposition would produce in the minds of the trier of the facts a firm conviction as to the essential elements of the claim and a high probability as to the correctness of the conclusions.
"Proof by clear and convincing evidence requires a level of proof greater than a preponderance of the evidence or substantial weight of the evidence, but less than beyond a reasonable doubt.
"You take that into consideration whenif you determine ... that the plaintiff is entitled to punitive damages."
I will assume that the jury did not find clear and convincing evidence of wantonness or willfulness to support a punitive damages award of $4,000,000 for Janice Denise Simpson, Ruth McCord, Louisiana Waddell, and Felicia Diane Simpson's claims, but did find substantial evidence of negligence, wantonness, or willfulness to support an award of $4,000,000 in punitive damages in the wrongful death case. Punitive damages "should not exceed an amount that will accomplish society's goal of punishment and deterrence" in wrongful death cases. General Motors Corp. v. Johnston, 592 So.2d 1054, 1063 (Ala. 1992). Alabama's wrongful death statute (or this Court's interpretation of it, which has thus far escaped legislative correction) is "a riddle wrapped in a mystery inside an enigma."[7] I have no standard by which to determine whether a wrongful death award is excessive or inadequate.[8] It is not excessive or inadequate if five members of this Court hold that it is not excessive or inadequate; it is excessive or inadequate if five members of this Court hold that it is excessive or inadequate. At least five other members of this Court hold that the award in this wrongful *1037 death case is not excessive; therefore, I concur.
However, the punitive damages verdicts that a single jury returned for Felicia Diane Simpson, Louisiana Waddell, Janice Denise Simpson, and Ruth McCord are inconsistent verdicts, because they were all supposed to be based on the same standard: clear and convincing evidence of "culpability of the defendants and necessity for preventing similar wrong in the future." Punitive damages qua punitive damages also must not exceed an amount that will accomplish society's goals of punishment and deterrence. Wilson v. Dukona Corp. 547 So.2d 70 (Ala.1989). The $1,000,000 punitive awards as to Felicia Diane Simpson and Louisiana Waddell exceeded society's goal of punishment and deterrence by $750,000 each, for the same jury set society's goal of punishment and deterrence for the same act or omission giving rise to liability at $250,000 as to Janice Denise Simpson and Ruth McCord. Therefore, the verdicts are inconsistent. Rather than reverse and remand for a new trial, I would affirm the judgment, conditioned upon remittitur of $750,000 of the punitive damages awards to Felicia Diane Simpson and Louisiana Waddell, so that the punitive damages award to each plaintiff other than Ms. Harris, as administratrix, is $250,000.

On Application for Rehearing
ALMON, Justice.
OPINION MODIFIED; APPLICATION FOR REHEARING OVERRULED.
HORNSBY, C.J., and MADDOX, SHORES, STEAGALL and INGRAM, JJ., concur.
HOUSTON, J., concurs in part and dissents in part.
NOTES
[1] The plaintiffs are all members of the same family. The following diagram shows the relationships among the family members involved in this case:
 Ruth McCord
 Louisiana Waddell
 Dexter McCord Annie Harris
 ---------------------------------------------
 Joyce Simpson Janice Simpson Felicia Simpson

[2] When Louisiana Waddell, Felicia Simpson, and Janice Simpson were admitted, the levels of carbon monoxide in their blood was as follows: Louisiana Waddell 41%, Felicia Simpson 25%, Janice Simpson 14.6%. Dr. Edwin T. Johnson, the plaintiffs' medical expert, testified that these tests were conducted after they had been administered pure oxygen and, therefore, that the levels of carbon monoxide in their blood had probably been much higher.

According to Dr. Johnson's undisputed testimony, a level of 60% is lethal for anyone; below this threshold a variety of factors determine whether the exposed person will survive.
[3] Before this case went to trial, the plaintiffs and Highland Home Propane Gas Company entered into a settlement agreement, and all claims against Highland Home were dismissed.
[4] The record on appeal included exhibits, among which were a jacket top, a draft hood, and a vent pipe.
[5] Sears and State Industries do not direct their argument here to the $4,000,000 in punitive damages awarded on the wrongful death claim. We note that § 6-11-20(a), Ala.Code 1975, specifically excludes punitive damages awarded in wrongful death actions from the requirement of proof by "clear and convincing evidence." Sears and State Industries, however, do raise the issue of excessiveness with regard to the $4,000,000 award; that issue is discussed infra.
[6] We note that Ruth McCord had received $142,500 in a pretrial settlement with several other defendants, who were dismissed before trial.
[*] Although Chief Justice Hornsby did not sit at oral argument, he has studied the record and listened to the tapes of oral argument.
[7] Winston Churchill, radio broadcast, October 1, 1939 (referring to the Soviet Union).
[8] This Court has recently affirmed an award of $500 in a wrongful death case in which the act or omission that the jury found proximately caused the death was no less culpable than the act or omission of Sears and State Industries in the case at issue. Rose v. Rogers, [Ms. 1920032, August 27, 1993] ___ So.2d ___ (Ala.1993).